# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| REGINA D. MILLER, on behalf of herself and all others similarly situated, | **Civil Action No.: 3:25-cv-599** |
| Plaintiff, | **Chief Judge William L. Campbell, Jr.** |
| vs. | **Magistrate Judge Barbara D. Holmes** |
| DOLLAR GENERAL CORPORATION and the BENEFIT ADMINISTRATION COMMITTEE. | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| Defendants. | |

Plaintiff Regina D. Miller, individually and on behalf of the Class defined below of similarly situated persons, alleges the following against Dollar General Corporation ("Dollar General") and the Dollar General Benefits Administration Committee ("BAC," together with Dollar General, "Defendants") based upon personal knowledge with respect to herself and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters:

## NATURE OF THE ACTION

1.      It is both unfair and unlawful for Defendants to impose health insurance surcharges on employees who use tobacco products without complying with the protections guaranteed under federal law. This lawsuit challenges Defendants' practice of charging a monthly "tobacco surcharge" without providing the clear and mandatory disclosures required by the Employee Retirement Income Security Act of 1974 ("ERISA"). Specifically, ERISA regulations require wellness programs that are tied to tobacco-use surcharges to inform participants of the availability of a reasonable alternative standard and to disclose that the recommendations of a participant's

1

personal physician will be accommodated. *See* 29 C.F.R. § 2590.702(f)(4)(v) and 45 C.F.R. § 146.121(f)(4)(iv). Defendants' disclosures are both incomplete and misleading because the Summary Plan Description ("SPD") buries reference to physician involvement in the *Better Life Wellness Program* section without clearly applying it to the separate "Tobacco-Free Credit," while the Benefit Guides provided at enrollment omit that disclosure entirely. Upon information and belief, Defendants did not provide participants with the SPD during annual enrollment, and even if they had, the structure and language of the SPDs are so confusing and misleading, suggesting that physician accommodations applied only to wellness activities and not to the tobacco surcharge, that participants would not have the information needed to make informed decisions regarding the benefits to which they are entitled under the Plan. By failing to provide clear notice of participants' rights, Defendants violated ERISA's anti-discrimination and fiduciary duty provisions and deprived employees of the ability to avoid unlawful surcharges through the involvement of their own doctors.

2. Tobacco surcharges have become increasingly common, but they are only lawful if imposed through a ***compliant*** "wellness program" that satisfies strict conditions established by the Departments of Labor, Health and Human Services, and the Treasury (collectively, the "Departments") under ERISA. In 2014, the Departments jointly issued detailed regulations interpreting ERISA § 702, 29 U.S.C. § 1182, which prohibits discrimination in group health plans based on health status. These regulations set forth clear criteria that "***must*** be satisfied" for a tobacco surcharge to fall within the safe harbor for health-contingent wellness programs. One of those core requirements is the obligation to provide participants with clear notice of the availability of a reasonable alternative standard and an express statement that the recommendations of a participant's personal physician will be accommodated. *See* 29 C.F.R. § 2590.702(f)(4)(v); 45

2

C.F.R. § 146.121(f)(4)(iv). Failure to include this notice renders the program noncompliant, and courts routinely defer to the agency's interpretation of its own regulatory framework when evaluating such violations. See *Auer v. Robbins*, 519 U.S. 452 (1997).

3. The Departments' regulatory requirements are designed to ensure that wellness programs genuinely promote health and do not operate as a "subterfuge for discriminating based on a health factor." 29 C.F.R. § 2590.702(f)(4)(iii). To qualify as a compliant wellness program, employers must provide meaningful notice to participants, including a statement that a reasonable alternative standard is available and that the recommendations of the participant's personal physician will be accommodated. These notice obligations are essential: they ensure that participants are aware of their rights and have a fair opportunity to avoid discriminatory surcharges. Defendants' wellness program fails this basic test. The Benefit Guides that are used by employees to make annual enrollment elections describe the tobacco surcharge and credit but omit any disclosure that personal physician recommendations will be honored. The SPD, while referencing physician involvement, does so only in the context of the "Better Life Wellness Program" and not in connection with the tobacco surcharge, creating a misleading impression that the right does not apply to the surcharge at all. This structural confusion and omission deprived participants of clear notice of their rights and resulted in unlawful surcharges that shifted healthcare costs onto employees without complying with ERISA's nondiscrimination rules.

4. The need for regulatory safeguards surrounding these types of wellness programs is underscored by studies showing little evidence that wellness programs effectively reduce healthcare costs through health improvement. Instead, the "savings" employers claim often result in cost-shifting onto employees with higher health risks, disproportionately burdening low-income

3

and vulnerable workers who end up subsidizing their healthier colleagues.[1] Without proper notice and transparent rules, these program can function less as health initiative and more as revenue-generating schemes. That danger is increased when employers omit the mandatory disclosures that would allow employees to avoid surcharges through their physicians' recommendations. The regulatory framework is designed precisely to prevent this kind of misuse by requiring plan sponsors to prove compliance once challenged, thereby ensuring that wellness programs serve health goals rather than simply penalizing those least able to shoulder extra costs.

5. Outcome-based programs,[2] such as smoking cessation programs, must offer a clearly defined "reasonable alternative standard" that allows "all similarly situated individuals" to avoid a surcharge if they are unable to meet the program's initial standard, such as certifying that they are tobacco-free. Critically, ERISA's implementing regulations require that plans clearly disclose the availability of a reasonable alternative standard *and* state that participants' personal physician recommendations will be accommodated.[3] These disclosures must appear ***in all plan***

---

[1] Horwitz, J. R., Kelly, B. D., & DiNardo, J. E. (2013). *Wellness incentives in the workplace: Cost savings through cost shifting to unhealthy workers*. Health Affairs, 32(3), 468–476, 474 ("wellness programs may undermine laws meant to prevent discrimination on the basis of health status. Since racial minorities and people with low socioeconomic status are more likely than others to have more health risks, they are also more likely to be adversely affected by cost shifting"); *see also* Dorilas, E., Hill, S. C., & Pesko, M. F. (2022). *Tobacco surcharges associated with reduced ACA marketplace enrollment*. Health Affairs, 41(3), Abstract (finding that tobacco surcharges are significant barriers to affordable health insurance).

[2] "An outcome-based wellness program is a type of health-contingent wellness program that requires an individual to attain or maintain a specific health outcome (such as not smoking or attaining certain results on biometric screenings) in order to obtain a reward." 29 C.F.R. § 2590.702(f)(1)(v).

[3] *Incentives for Nondiscriminatory Wellness Programs in Group Health Plans*, 78 Fed. Reg. 33158, 33163 (June 3, 2013) (hereinafter the "**Final Regulations**"); *see also* 29 C.F.R. § 2590.702(f)(4)(v).

*materials that describe the terms of the wellness program*, not just the SPD.[4] Defendants' enrollment materials, including the Benefit Guides used at annual enrollment, fail to include this mandatory language. Instead, the SPD buries physician involvement language in the Better Life Wellness Program section, without applying it to the separate Tobacco-Free Credit, leaving participants uncertain and unaware of their rights with respect to the surcharge. This omission deprived them of the notice they needed to avoid the surcharge, rendering the program noncompliant with ERISA's wellness regulations and reflecting a broader breach of fiduciary duty in administering the Plan.

6.      Defendants are not entitled to the statutory safe harbor because their wellness program fails to satisfy the mandatory regulatory requirements that *"must be satisfied"* for a premium differential based on a health factor to be lawful under ERISA. Final Regulations, 33160. The core deficiency of Defendants' program is that it fails to inform participants that their personal physician's recommendations will be accommodated. The Benefit Guides, which, upon information and belief, are the only documents distributed to employees during enrollment discussing the tobacco surcharge, describe that surcharge but omit the required disclosure altogether, while the SPD places physician accommodation language only within the Better Life Wellness Program section, leaving participants with the impression that it does not apply to the tobacco surcharge. This omission violates the criteria for a compliant program outlined in the Final Regulations, which require that the disclosure appear in *all* materials that describe the terms of the

---

[4] Final Regulations, 33166 ("For ERISA plans, wellness program terms (including the availability of any reasonable alternative standard) *are generally required to be disclosed in the summary plan description (SPD), as well as in the applicable governing plan documents* (which must be provided upon request), if compliance with the wellness program affects premiums, cost sharing, or other benefits under the terms of the plan." (emphasis added)).

5

program to ensure participants are fully aware of all of the avenues available to them to avoid the surcharge. Although Defendants structure the "reward" in a way that disadvantages participants who complete the alternative standard, the more fundamental flaw is their failure to provide the mandatory disclosures in the very documents employees rely upon when making enrollment decisions. These structural defects demonstrate that Defendants' program is not a compliant "program[] of health promotion and disease prevention" but instead a cost-shifting mechanism that unlawfully transfers healthcare costs to employees without satisfying the conditions necessary to invoke ERISA's safe harbor.

7. Plaintiff is a former employee of Dollar General who paid the unlawful premium differential to maintain health insurance coverage under the Plan. This surcharge imposed an additional financial burden on her and continues to impose such a burden on those similarly situated.

8. Plaintiff brings this lawsuit individually and on behalf of all similarly situated Plan participants and beneficiaries, seeking to recover these unlawfully charged fees and for Plan-wide equitable relief to prevent Defendants from continuing to profit from their violations under 29 U.S.C. § 1109. Under 29 U.S.C. § 1109, Defendants are fiduciaries of the Plan who have legal obligations to act in the best interests of Plan participants and to comply with federal law. Plaintiff, on behalf of herself and the Plan as a whole, seeks appropriate equitable relief under 29 U.S.C. §§ 1132(a)(2) and (a)(3) to address Defendants' ongoing violations of ERISA's anti-discrimination provisions.

**PARTIES**

9. Plaintiff Regina Miller is, and at all times mentioned herein was, an individual citizen of the State of Indiana residing in the County of Marion. Plaintiff Miller was an employee

6

of Dollar General, who paid a premium differential in the form of increased premiums for health insurance of roughly $40 per month (roughly $480 annually) offered by Defendants. Plaintiff Miller was required to pay this tobacco surcharge to maintain health insurance under the Plan.

10. Plaintiff is a participant in the Plan pursuant to 29 U.S.C. § 1002(7).

11. Dollar General is a leading national retailer with thousands of store locations across the country. It operates a chain of discount stores offering a wide range of consumer goods, including household items, food, and health-related products, and employs tens of thousands of workers nationwide. As of December 31, 2023, the Plan had over 188,000.

12. Dollar General is a Tennessee corporation with its principal place of business in Goodlettsville, Tennessee. Dollar General is the sponsor of the Dollar General Employee Benefits Plan (the "Plan") and is subject to the provisions and statutory requirements of ERISA pursuant to 29 U.S.C. § 1002(3) and is a fiduciary under 29 U.S.C. § 1002(21) to the extent it exercises discretionary authority and control over the assets of the Plan.

13. The BAC is the named fiduciary of the Plan under ERISA. The Committee is responsible for the overall administration and operation of the Plan, including oversight of plan communications, compliance with ERISA's disclosure requirements, and ensuring that surcharges and wellness programs are administered in accordance with the law.

## JURISDICTION AND VENUE

14. The Court has subject matter jurisdiction pursuant to 29 U.S.C. §1132(e)(1) and § 28 U.S.C. 1331, as this suit seeks relief under ERISA, a federal statute. It also has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the

7

number of class members is over 1,000, many of whom have different citizenship from Defendants. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

15. This Court has personal jurisdiction over Dollar General because it is incorporated and headquartered in this District, and it has purposefully availed itself of the privilege of conducting business in Tennessee. This Court has jurisdiction over the BAC because, upon information and belief it is an unincorporated association existing under the laws of the State of Tennessee. The BAC transacts business in this District, maintains continuous and systematic contacts within the State of Tennessee, and has purposefully availed itself of the privilege of conducting business here. Further, upon information and belief, the individual members of the BAC reside and work in this District.

16. Venue is proper in this District under 2 U.S.C. 1132§ (e)(2) because Dollar General is headquartered in this District and this is a District in which Defendants may be found.

<strong><u>FACTUAL BACKGROUND</u></strong>

## I. DEFENDANT'S TOBACCO SURCHARGE VIOLATES ERISA'S ANTI-DISCRIMINATION RULE

### A. Statutory and Regulatory Requirements

17. To expand access to affordable health insurance coverage, the Affordable Care Act ("ACA") amended ERISA to prohibit any health insurer or medical plan from discriminating against participants in providing coverage or charging premiums based on a "health-related factor," including tobacco use. Under this rule, a plan "may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution that is greater than such premium or contribution for a similarly situated individual enrolled in the plan based on any health-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual." ERISA § 702(b)(1), 29 U.S.C. § 1182(b)(1).

8

18.	The statute permits group health plans to "establish[] premium discounts or rebates . . . in return for adherence to ***programs of health promotion and disease prevention***" (29 U.S.C. § 1182(b)(2)(B)(emphasis added)); however, these "wellness programs"—to qualify for this statutory safe-harbor exception—must strictly adhere to the mandated regulatory requirements.

19.	Under ERISA § 505, 29 U.S.C. § 1135, Congress granted the Department of Labor the authority to issue regulations, including the power to establish regulations prohibiting discrimination against participants and beneficiaries based on their health status under ERISA § 702, 29 U.S.C. § 1182. This authority empowers the Secretary of Labor (the "Secretary") to "prescribe such regulations as he finds necessary or appropriate to carry out the provisions of" Title I of ERISA. (29 U.S.C. § 1135). Furthermore, ERISA § 734, 29 U.S.C. § 1191c, explicitly reinforces the Secretary's authority to issue regulations concerning group health plan requirements, which grants the power to "promulgate such regulations as may be necessary or appropriate to carry out the provisions" of ERISA Title I, Part 7. 29 U.S.C. § 1191c.

20.	Exercising this delegated authority, in 2006, the Secretary issued regulations through the notice-and-comment rulemaking process outlining the criteria that a wellness program must meet to qualify for the premium non-discrimination exception under ERISA § 702(b). *See* Final Regulations, 33158–59. Following the amendments by the Affordable Care Act ("ACA") and Public Health Service Act ("PHSA") in 2010, the Departments published proposed regulations in November 2012 to "amend the 2006 regulations regarding nondiscriminatory wellness programs." *Id.*, 33159. These regulations (i.e., the Final Regulations) were approved and signed in 2013 to be effective January 1, 2014. *Id.*, 33158.

9

21. The Final Regulations specify that health promotion or disease prevention programs, such as outcome-based wellness initiatives (i.e., smoking cessation programs), must meet detailed requirements to qualify for the safe harbor. As the Departments explained, these criteria "***must be satisfied*** in order for the plan or issuer to qualify for an exception to the prohibition on discrimination based on health status." *Id.*, 33163. "That is," the Departments explained, "these rules set forth criteria for an ***affirmative defense*** that can be used by plans and issuers in response to a claim that the plan or issuer discriminated" against participants. *Id.* (emphasis added). That means once a participant alleges a discriminatory surcharge, the burden is on the employer to prove that it complied with *all* the necessary regulatory criteria, including disclosure in all plan materials.

22. Compliance with the regulatory criteria is ***not*** optional and cannot be satisfied by partial or confusing disclosure. These criteria serve as the standard by which these wellness programs can be evaluated and are the only lawful pathway for plans to impose health-based premium differentials without violating ERISA's anti-discrimination provisions. *See* Final Regulations, 33160 ("***these [F]inal [R]egulations set forth criteria for a program of health promotion or disease prevention*** . . . that ***must be satisfied*** in order for the plan or issuer to qualify for an exception to the prohibition on discrimination . . . ." (emphases added)).

23. In satisfying each of the criteria, plans can ensure that wellness programs are "not a subterfuge for underwriting or reducing benefits based on health status." *Id.* They prevent employers from using surcharges as a revenue-generating mechanism dressed up as a program of health promotion. If a program fails to meet even one of these requirements, the program does not qualify as a "program[] of health promotion" and cannot qualify under ERISA's statutory carve-out. That is precisely the flaw here. Defendants' tobacco surcharge program omitted the mandatory

10

disclosures in the materials employees actually used to elect coverage, making the program a cost-shifting penalty rather than a lawful wellness initiative. *See* § 2590.702(f)(4) (describing the "[r]equirements for outcome-based wellness programs," stating that a program "does not violate the provisions of this section *only if **all** of the [] requirements are satisfied*." (emphasis added)).[5] In sum, a wellness program that fails to satisfy each criterion is not a legitimate health promotion initiative but an unlawful penalty that discriminates based on health status, in direct violation of ERISA's protections.

### B. Regulatory Criteria

24.     To comply with ERISA and avoid unlawful discriminatory surcharges, outcome-based wellness programs must meet the following five (5) criteria:

(a) Frequency of opportunity to qualify: Participants must be given at least one chance annually to qualify for the reward associated with the program to ensure ongoing accessibility and fairness. 29 C.F.R. § 2590.702(f)(4)(i).

(b) Size of reward: penalties or rewards cannot exceed 50% of the cost of employee-only coverage. § 2590.702(f)(4)(ii)

---

[5] Congress codified parts of the 2006 regulations regulatory criteria when, through the Patient Protection Act ("PPA") and ACA, it amended the PHSA, and incorporated (nearly verbatim) the regulatory language into ERISA. *See* 42 U.S.C. § 300gg-4(j)(3); 29 U.S.C. § 1185d(a)(1) ("[T]he provisions of part A of title XXVII of the [PHSA] [42 U.S.C. § 300gg *et seq*.] (as amended by the [PPA and ACA]) shall apply to group health plans, and health insurance issuers providing health insurance coverage in connection with group health plans, as if included in this subpart[.]"). Since then, the Departments have, in accordance with the they were granted, updated the regulatory framework through the Final Regulations, refining and clarifying the requirements to ensure compliance with ERISA's nondiscrimination provisions and the statutory criteria established by Congress. *See* 42 U.S.C. § 300gg-4(n) ("Nothing in this section shall be construed as prohibiting the Secretaries of Labor, Health and Human Services, or the Treasury from promulgating regulations in connection with this section"); *see also* 45 C.F.R. § 146.121(f) (adopting identical language to § 2590.702(f)).

(c) Reasonable design: programs must be "reasonably designed" to promote health and cannot be "a subterfuge for discriminating based on a health factor." This determination is based on all the relevant facts and circumstances. "To ensure that an outcome-based wellness program is reasonably designed to improve health and does not act as a subterfuge for underwriting or reducing benefits based on a health factor, a reasonable alternative standard to qualify for the reward must be provided to any individual who does not meet the initial standard based on a measurement, test, or screening. . . ." § 2590.702(f)(4)(iii)).

(d) Uniform availability and reasonable alternative standards: "The *full reward* under the outcome-based wellness program must be available to *all similarly situated individuals*." 29 C.F.R. § 2590.702(f)(4)(iv) (emphasis added).

(e) Notice of availability of reasonable alternative standard: notice must include (a) instructions on how to access the reasonable alternative standard; (b) contact information for inquiries about the alternative standard; and (c) an explicit statement that participants' personal physician's recommendations will be accommodated. *See* § 2590.702(f)(4)(v).

25. The Departments provided valuable insight into each of the criteria, reflecting their intent to operationalize the statute's protections in a manner that both promotes health and prevents discriminatory practices under ERISA.

26. Regarding the first criteria, "the once-per-year requirement was included as a bright-line standard for determining the minimum frequency that is consistent with a reasonable design for promoting good health or preventing disease." Final Regulations, 33162. The once-per-

12

year requirement ensures that participants have a meaningful opportunity to participate in a reasonable alternative standard.

27.     The Final Regulations make clear that whether a wellness program offers a "reasonable alternative standard" depends on the totality of the circumstances. *See* 29 C.F.R. § 2590.702(f)(4)(iv)(C). Plans are not permitted to impose unreasonable burdens or barriers that frustrate access to or ability to satisfy the alternative standard.

28.     For health contingent wellness programs, the Final Regulations require the notice be disclosed "in ***all*** plan materials describing the terms of" the program. 29 C.F.R. § 2590.702(f)(3) and (4) (emphasis added); *see also* 42 U.S.C. § 300gg-4(j)(3)(E). Further, the Final Regulations establish that "[f]or ERISA plans, wellness program terms (including the availability of any reasonable alternative standard) are generally required to be disclosed in the summary plan description (SPD), as well as in the applicable governing plan documents . . . if compliance with the wellness program affects premiums . . . under the terms of the plan." Final Regulations, 33166. Thus, plans that charge their participants more and fail to provide a reasonable alternative standard or the requisite notice violate these requirements, preventing these wellness programs from qualifying for the safe-harbor exception and establishing them as discriminatory wellness programs.

29.     Defendants' tobacco surcharge is unlawful because it does not provide a compliant wellness program because its program fails to provide the disclosures required by the Final Regulations. Specifically, the program fails to disclose in all plan materials that participants may involve their own physicians and that physician recommendations will be accommodated. As discussed, the Final Regulations provide that outcome-based wellness programs, such as those

13

involving tobacco cessation programs, are permissible under ERISA *only if __all__ regulatory requirements are satisfied*. *See* 29 C.F.R. § 2590.702(f)(4).

## II.   DEFENDANTS CANNOT AVAIL THEMSELVES OF ERISA'S SAFE HARBOR

30.     Dollar General's tobacco surcharge program violates ERISA because it is not "program[] of health promotion or disease prevention" within the meaning of 29 U.S.C. § 1182(b)(2)(B). To qualify for ERISA's safe harbor under § 1182(b)(2)(B), a wellness program must satisfy *all* the regulatory conditions, including providing adequate and timely notice to participants of all available avenues for avoiding the surcharge. These requirements are designed to ensure that wellness programs function as genuine health initiatives rather than as financial penalties disguised as incentives.

31.     Defendants' program fails this test because the very materials employees rely on during enrollment—the Benefit Guides—describe the tobacco surcharge and Tobacco-Free Credit but omit the mandatory disclosure that participants may involve their personal physicians and that physician recommendations will be honored. The SPD, by contrast, references physician accommodations only in the Better Life Wellness Program section, leaving it unclear whether those rights apply to the tobacco surcharge at all. The omission of this notice in the Benefit Guides and the confusing presentation in the SPD prevent participants from understanding their rights, deprives them of the knowledge that they can avoid the surcharge through physician involvement, and confirms that the program does not qualify for ERISA's safe harbor.

32.     Defendants' Benefits Guides describe the tobacco surcharge and the Tobacco-Free Premium Credit but provide no instructions on how to request a reasonable alternative standard, no contact information, and no mention that a participant's personal physician may recommend an

14

alternative. The following shows the extent of the information provided to participants during open enrollment in the Benefit Guides:

**Earn a Tobacco-Free[1] Premium Credit**

Indicate your tobacco-use status on your HA:

- Are you tobacco-free? Receive a monthly $40 Tobacco-Free Premium Credit.
- **Need help quitting or preventing relapse?** The Better Life Tobacco Cessation Program can support you in your tobacco-free journey. Plus, if you complete[2] the program, you'll earn up to a $480 Tobacco-Free Premium Credit at year-end.[3]

  To enroll, upon completing the HA and tobacco-use attestation, join the "My Personal Tobacco Wellness Coach" activity on DGWell and schedule your first call with a coach.

[1] Tobacco products include cigarettes, pipes, cigars, and smokeless forms including chewing tobacco, snuff and dip, and electronic cigarettes.

[2] Program completion is defined as completing four (4) tobacco cessation calls with your coach (once every 45 days beginning the day you join the program).

[3] If eligible, the year-end credit will be provided as a lump-sum payment on your paycheck. You must be actively enrolled in the Medical Plan at the time of payment to receive the credit. Amount based on number of months in the Medical Plan during the year and subject to applicable tax withholdings.

This description lays out the surcharge and cessation program but omits the disclosures mandated by 29 C.F.R. § 2590.702(f)(4)(v).

33. By contrast, the 2019 SPD—which, upon information and belief, was ***not*** provided to participants during open enrollment—contains disclosure language, but ***only*** within the Better Life Wellness Program Section, and makes no reference to the Tobacco-Free Credit. It provides:

15

**Better Life Wellness Program:**
The Better Life Wellness Program is a voluntary program designed to encourage Covered Employees to take steps to improve their overall health and provide them with helpful resources to address areas of concern that can lead to serious health complications.

**Reasonable Alternative Standard:**
The Plan is committed to helping Covered Employees achieve their best health. Rewards for participating in the Better Life Wellness Program are available to all Plan participants. If You think You might be unable to meet a standard for a reward under the Better Life Wellness Program, You might be able to earn the same reward by different means. If the activity or goal requires You to attain or maintain a specific health outcome, the Better Life Wellness Program will work with You (and, if You wish, with Your doctor) to find an activity or goal with the same reward that is right for You in light of Your health status. If the activity or goal does not require You to attain or maintain a specific health outcome, the Better Life Wellness Program will provide You an alternative if it is unreasonably difficult due to a medical condition or medically inadvisable for You to attempt to satisfy the activity or goal. Contact us at 1-800-521-9919, option 3, then option 1 for more information.

34. The above disclosure is misleading for two reasons. First, it is expressly tied only to the Better Life Wellness Program and not to the Tobacco-Free Premium Credit. The SPD organizes these as entirely separate programs. The Better Life section describes activities such as health assessments and wellness coaching, while the Tobacco-Free Credit is presented elsewhere as a surcharge/credit program. The disclosure language regarding physician involvement is confined to the Better Life section and makes no reference to the Tobacco-Free Credit, leaving participants with the reasonable impression that their physician's recommendations cannot exempt them from the tobacco surcharge. Second, the last sentence of the "Reasonable Alternative Standard" disclosure invokes the regulatory hardship language for activity-only programs, referring to circumstances where it is "unreasonably difficult" due to a "medical condition" or where participation would be "medically inadvisable." That type of disclosure is required only for *activity-based* wellness programs, such as walking or nutrition activities, not for *outcome-based* programs like tobacco cessation. By using the wrong standard, the SPD both confuses and misleads participants. It suggests that any accommodation would be limited to activity-based wellness goals, not the outcome-based tobacco surcharge. Together, these flaws establish that the SPD's reasonable alternative standard language is ***not*** directed at the Tobacco-Free Premium Credit at

16

all. Instead, it applies only to the Better Life Wellness Program, which is a completely separate program with different requirements, activities, and rewards. That leaves participants without any clear indication that physician recommendations apply to the tobacco surcharge, thereby failing to provide the disclosures mandated by 29 C.F.R. § 2590.702(f)(4)(v) and rendering the program noncompliant with ERISA.

35. Further, the 2021 SPD imposes rigid deadlines that function as barriers to eligibility for the Tobacco-Free Premium Credit. As the last two sentences of the Tobacco-Free Credit section explain:

**Tobacco-Free Credit:**
The Better Life Tobacco Cessation Program is available to eligible Employees who are tobacco users, defined as individuals who have used tobacco (cigarettes, cigars, pipes, smokeless tobacco and e-cigarettes) in the six (6) months prior to enrollment and wish to stop using tobacco. The Relapse Prevention Program is available to eligible Employees who have quit using tobacco within the last six (6) months prior to enrollment who want help to prevent a relapse. Participants in the Better Life Tobacco Cessation and Relapse Prevention Programs can receive covered nicotine replacement aids at no cost. As a reward, all Covered Employees who do not use tobacco will receive a $40 monthly credit on Plan premiums. Employees who complete the Tobacco Cessation or Relapse Prevention programs will receive the Tobacco-Free Credit, of up to $480 at year-end.* To receive the Tobacco-Free Credit, the eligible Employee must designate at the time of enrollment whether he or she is a non-tobacco user, a tobacco user who will enroll in the Tobacco Cessation Program, or a tobacco user who quit using tobacco within the last six (6) months and who will enroll in the Relapse Prevention Program. Employees that select to participate in one of these programs must contact Onlife Health at 855-861-9398 to sign up for a program by the communicated deadline. Failure to do so will make You ineligible to receive the year-end Tobacco-Free credit of up to $480.

These clauses make eligibility for the credit contingent not only on enrollment during a narrow window, but also on the completion of a rigid sequence of program activities by specific deadlines and continued participation through year-end. This creates the impression that unless an employee both enrolls in and completes all scheduled activities within the allotted deadlines, they are categorically ineligible for the credit, even if their own physician recommends a different course, undermining the guarantee that "all similarly situated individuals" have the opportunity to avoid the surcharge through a reasonable alternative standard at any time during the plan year. Also, by

17

putting these deadlines in the Tobacco-Free Credit section while placing the physician-accommodation language elsewhere (i.e., in the Better Life Wellness Program) the SPD strongly suggests that physician involvement is not available for the tobacco surcharge program at all. These deadlines operate as unlawful barriers to the exercise of participants' statutory rights.

36. Defendants' modifications to the SPD's language over successive years underscore the deliberate nature of their disclosure failures. As shown above, earlier versions of the SPD included contact information for employees to obtain further details, but later versions of the Tobacco-Free Premium Credit section omitted such information altogether, as shown in the 2025 SPD below:

**Better Life Tobacco Cessation Program:**

The Better Life Tobacco Cessation Program is available to Covered Employees who are tobacco (cigarettes, cigars, pipes, smokeless tobacco, and e-cigarettes) users and wish to stop using tobacco. All Covered Employees who do not use tobacco will receive a $40 monthly Tobacco-Free Premium Credit on Plan premiums. Covered Employees who are tobacco users but complete the Tobacco Cessation Program will receive the year-end Tobacco-Free Premium Credit of up to $480[4].

To receive the Tobacco-Free Premium Credit, the Covered Employee must complete the wellness questionnaire to designate his or her tobacco use status and, if a tobacco user, attest to willingness to enroll in a Tobacco Cessation Program. To enroll in a Tobacco Cessation Program, the Covered Employee must complete their Health Assessment and then enroll in the Tobacco Cessation Program in the DGWell platform by the communicated deadline. Covered Employees enrolling during Annual Enrollment must complete the Health Assessment within the Annual Enrollment deadline and then enroll in the Tobacco Cessation Program on the DGWell platform by the communicated deadline.

Program completion is defined as completing five (5) calls with a Tobacco Cessation Coach by the deadline provided. Failure to complete the program will result in loss of eligibility for the year-end Tobacco-Free Premium Credit.

Not only did Defendants remove the contact information, which deprived participants of a clear avenue to ask questions or invoke their rights to a reasonable alternative standard, despite Dollar General's knowledge based on prior versions that this was required, but it moved these paragraphs to the bottom of the section, further disassociating it with the Better Life Wellness Program.

18

37. Further, as the 2021 SPD makes clear, the employees have just "45 days to complete" a health assessment, from the time of enrollment, to qualify for the reward. Then, employees must complete four calls within prescribed deadlines throughout the year or they will not be eligible for the year-end tobacco credit. These rigid procedural hurdles effectively disqualify participants who miss any of these narrow windows, despite ERISA's guarantee that all similarly situated individuals must be able to access the "full reward" once they satisfy the alternative standard.

38. By removing contact information from the SPDs, despite including it in prior versions, while simultaneously layering on 45-day deadlines and completion requirements throughout the year, Defendants have maximized the chances that participants will misunderstand or forfeit their rights, resulting in more money going to Dollar General. The Benefit Guides compounded the confusion by omitting the mandatory disclosures entirely that prevented participants from knowing they could involve their own physicians in the process of avoiding the surcharge. This omission is particularly significant given that earlier versions of the SPD included the physician accommodation language in the Better Life Wellness Program section, not tied to the tobacco surcharge. As a result, participants reviewing the Benefit Guides had no way of knowing that physician involvement was a protected right, and participants reviewing the SPD would reasonably conclude the accommodation applied only to Better Life activities. Because the Benefit Guides are the documents actually placed in employees' hands during the annual enrollment process, they function as the primary source of information for participants making benefit elections. Participants relied on these materials that flatly omitted the disclosure of their rights under ERISA. Even if the SPD were available somewhere, the absence of this language in

19

the Guides violated the regulation's explicit requirement that notice of the reasonable alternative standard appear in *all* plan materials describing the program. 29 U.S.C. § 2590.702(f)(4)(v).

39. Further, the changes Defendants made to Plan materials over the years demonstrate that the SPD's disclosure language was not only incomplete but actively misleading and less transparent over time. Earlier versions of the SPD included contact information for employees to obtain additional details about the Tobacco-Free Premium Credit. In later years, however, Defendants removed this information altogether, leaving participants with no clear point of contact to inquire about reasonable alternatives or their rights under ERISA. This demonstrates a pattern of disclosure failures and administrative barriers that misled participants and obstructed their rights.

40. At a minimum, Defendants should have included the required notice language in every document describing the Tobacco-Free Premium Credit, including the Benefit Guides and the SPD; clearly stated that participants' personal physicians could recommend an alternative standard, and that such recommendations would be honored; provided contact information for participants to ask questions or request accommodations in all versions of the SPD and the Benefit Guides; and ensured that deadlines or procedural requirements were not unreasonably restrictive and did not mislead participants into believing they were ineligible for the credit if they failed to enroll or complete activities within narrow timeframes.

41. Had Defendants met these obligations, participants would have known that they could have avoided the surcharge at any time during the plan year by working with their doctors. This knowledge would have allowed participants, including Plaintiff and other members of the Class, to take action to prevent the surcharge from being deducted from their paychecks. Instead,

20

they were left with misleading or incomplete information, which gave them no reason to question Defendants' unlawful requirements or to assert their rights under ERISA.

42. Plaintiff and other participants reasonably relied on the incomplete and confusing information provided by Defendants. During annual enrollment, they reviewed the Benefit Guides, which described the tobacco surcharge but omitted the required disclosures, and made their elections under the belief that physician involvement was not an option. Even if participants later accessed the SPD, the physician-accommodation language was buried in the *Better Life Wellness Program* section, making it appear irrelevant to the tobacco surcharge. By failing to disclose participants' full rights, Defendants ensured that participants remained unaware of their ability to invoke their physicians' recommendations, and therefore they continued to pay unlawful surcharges that could have been avoided. The result was not merely informational harm but financial harm to participants and the Plan. Defendants' failure to provide the required disclosures led directly to employees paying surcharges they could have avoided, and allowed Dollar General to reduce its own contributions by offsetting them with participant dollars.

43. Allowing corporate entities like Dollar General to exploit their participants and unlawfully extract millions from them under the guise of a wellness program that is, in reality, a cash grab, directly contradicts ERISA's purpose of protecting workers from health-based discrimination. If unchecked, this practice would permit employers to manipulate wellness programs to deter participation and to disguise discriminatory revenue-generating schemes as health initiatives, shifting unjust financial burdens onto employees in violation of federal law.

III.  **DEFENDANTS' SELF-DEALING AND MISMANAGEMENT OF PLAN FUNDS**

44. Defendants administer the tobacco surcharge by designating which participants are charged and withholding the surcharge directly from participants' paychecks as a before-tax plan

contribution, alongside required premium deductions. The SPDs all makes clear that "Covered Employees who do not use tobacco will receive a $40 monthly Tobacco-Free Premium Credit on Plan premiums." These deductions are part of the funding stream for Plan coverage, not separate penalties, and are treated the same way as other contributions made to support the Plan's medical benefits.

45. The SPDs make clear that benefits under the Plan are funded by "contributions from Dollar General Corporation and from participating employees through salary reduction." By layering a tobacco surcharge on top of those required participant contributions, Defendants created what should have been a third stream of funding available to the Plan: (1) participants' required premium contributions, (2) Dollar General's promised company contribution amount, and (3) the additional tobacco surcharge. But instead of allowing all three funding streams to flow into the Plan, Defendants used the tobacco surcharge to offset Dollar General's funding obligation. Because the cost of coverage for each tier is fixed, every dollar of surcharge collected reduced Dollar General's contribution dollar-for-dollar. Thus, rather than increasing resources available to the Plan, the surcharge simply shifted costs away from Dollar General and onto participants. By applying surcharge proceeds to its own accounts, Defendant saves money it otherwise would have had to contribute as employer funding, and the Plan itself receives fewer overall contributions than it would have absent the surcharge.

46. This practice constitutes classic self-dealing because Defendants manipulated the Plan's funding structure to realize savings for Dollar General, depriving the Plan of the full benefit of the three distinct funding streams it should have received. This arrangement results in a clear loss to the Plan, not merely to individual participants. Every dollar of surcharge collected is one that Dollar General does not need to contribute, reducing the pool of funds available to pay claims

22

and administer benefits. Because the SPD frames the Tobacco-Free Credit as a premium adjustment tied to plan funding, the surcharge amounts are properly treated as part of Plan assets once deducted from employees' paychecks or factored into contribution calculations. *See* 29 C.F.R. § 2510.3-102 (employee contributions become Plan assets when withheld). By diverting those amounts to its own benefit, Dollar General diminished the Plan's funding stream.

47. In doing so, Defendants failed to act solely in the interest of participants and beneficiaries, as ERISA requires. Rather than use the surcharge proceeds to offset premiums for all participants or to strengthen the Plan's reserves, Dollar General retained the amounts for itself. The result is a direct benefit to Dollar General at the expense of the Plan's assets and participants' rights.

48. By structuring contributions in this way, Dollar General engaged in prohibited self-dealing under 29 U.S.C. § 1106(b)(1). The surcharge revenue was used to reduce the employer's share of plan expenses, generating a windfall to Defendant and depriving the Plan of the full funding it should have received. These practices demonstrate that Defendant's wellness program was not a bona fide health promotion initiative but a revenue-generating mechanism, in direct violation of ERISA's fiduciary duty and anti-discrimination provisions.

## CLASS DEFINITION AND ALLEGATIONS

49. Plaintiff brings this action individually and on behalf of all other similarly situated individuals, pursuant to Rule 23(b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure.

50. Plaintiff proposes the following Class definitions, subject to amendment as appropriate:

**Tobacco Surcharge Class**

23

All individuals residing in the U.S. who, from 2014 to the time of judgment, paid a tobacco surcharge in connection with their participation in a health or welfare plan offered by Defendants.

51. Excluded from the Class are Dollar General's officers and directors, and judicial officers and their immediate family members and associated court staff assigned to this case.

52. Plaintiff reserves the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

53. The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(1), (b)(2), and (b)(3).

54. **Numerosity**. This action is appropriately suited for a class action. The members of the Class are so numerous that the joinder of all members is impracticable. Plaintiff is informed, believes, and thereon alleges, that the proposed Class contains thousands of participants who have been damaged by Defendants' conduct as alleged herein, the identity of whom is within the knowledge of Defendants and can be easily determined through Defendants' records.

55. **Commonality**. This action involves questions of law and fact common to the Class. The common legal and factual questions include, but are not limited to, the following:

    a. Whether Defendants' tobacco surcharge discriminates against participants based on a health status related factor;

    b. Whether the smoking cessation program constitutes a *reasonable* alternative standard by which a participant could receive the "full reward" of the tobacco surcharge;

    c. Whether Defendants provided the notice in ***all*** the Plan materials describing the surcharge;

    d. Whether Defendants provided the required statement that participants' personal physicians' recommendations would be accommodated in all Plan materials discussing the premium differential;

    e. Whether Defendants' wellness program violates ERISA and the Final Regulations;

f.   Whether Defendants breached their fiduciary duties by collecting and retaining the tobacco surcharge and using those funds to offset Dollar General's own contributions to the Plan;

g.   Whether Defendants breached their fiduciary duties by failing to periodically review the terms of its wellness program to ensure compliance with ERISA and applicable regulations;

h.   Whether Dollar General breached its fiduciary duty by failing to properly monitor and overlook the activities of the BAC to ensure compliance with ERISA and the applicable regulations;

i.   The appropriate mechanisms to determine damages on a class-wide basis

56.   **Typicality**. Plaintiff's claims are typical of the claims of the members of the Class, because, *inter alia*, all Class members have been injured through the uniform misconduct described above and were charged improper and unlawful nicotine-related premium differentials. Moreover, Plaintiff's claims are typical of the Class members' claims because Plaintiff is advancing the same claims and legal theories on behalf of herself and all members of the Class. In addition, Plaintiff is entitled to relief under the same causes of action and upon the same facts as the other members of the proposed Class.

57.   **Adequacy of Representation**. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff and members of the Class each participated in health and welfare plans offered by Defendants and was harmed by Defendants' misconduct in that they were assessed unfair and discriminatory premium differential. Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained competent counsel experienced in complex litigation and class action litigation. Plaintiff has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff.

58.   **Superiority**. A class action is superior to other methods for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by

25

individual litigation of their claims against Defendants. It would be virtually impossible for a member of the Class, on an individual basis, to obtain effective redress for the wrongs done to him or her. Further, even if the Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no management difficulties under the circumstances here.

59.     Plaintiff seeks injunctive, declaratory, and equitable relief on grounds generally applicable to the Class. Unless the Class is certified, Defendants will be allowed to profit from their unfair and discriminatory practices, while Plaintiff and the members of the Class will have suffered damages. Unless Class-wide injunctions are issued, Defendants may continue to benefit from the violations alleged, and the members of the Class will continue to be unfairly treated.

## CAUSES OF ACTION

### COUNT I
### UNLAWFUL IMPOSITION OF A DISCRIMINATORY TOBACCO SURCHARGE
### (Violation of 29 U.S.C. § 1182)

60.     Plaintiff re-alleges and incorporate herein by reference allegations 1–59 of this Complaint.

61.     Defendants impose a tobacco-related premium differential on participants who use nicotine products without complying with the mandatory requirements of ERISA § 702. By imposing discriminatory monthly premium increases based on a health factor without satisfying the conditions required under the Final Regulations, Defendant violates 29 U.S.C. § 1182(b)(1)

26

and 42 U.S.C. § 300gg-4. These violations stem from structural deficiencies in Defendants' wellness program, including their failure to inform participants in the Benefit Guides that their personal physician's recommendations would be accommodated, and their placement of physician-accommodation language only in the Better Life Wellness Program section of the SPD, which is a completely separate program with different activities, requirements, and rewards. Defendants also embedded rigid and unreasonable procedural hurdles in the wellness program, such as requiring completion of a health assessment within 45 days of enrollment and mandating completion of five cessation-coach calls by specified deadlines throughout the year. These restrictions created unnecessary barriers to participation and misled employees into believing that failure to meet these deadlines permanently disqualified them from receiving the credit, even though ERISA guarantees the availability of a reasonable alternative standard.

62. ERISA explicitly prohibits group health plans from requiring "any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor." 29 U.S.C. § 1182(b). Defendants' Plan violates this prohibition in multiple respects: (i) it fails to disclose in the Benefit Guides that physician recommendations will be accommodated; (ii) it imposes arbitrary enrollment and completion deadlines that restrict access to the reasonable alternative standard; and (iii) it conditions receipt of the credit on year-end eligibility, depriving participants who paid surcharges throughout the year but lost coverage of both the surcharge and the promised credit. Further, upon information and belief, Defendants failed to include the required disclosure in all Plan materials, including the Tobacco-Free Credit section of the SPD itself. Because Defendants seek the protection of a regulatory safe harbor to justify an otherwise discriminatory practice, the burden

27

rests with Defendants to demonstrate full compliance with each element of the regulatory framework. *See Cunningham v. Cornell Univ.*, 145 S. Ct. 1020 (2025) (recognizing that regulatory compliance functions as an affirmative defense, and the burden may shift to defendants). Defendants cannot meet that burden.

63. Accordingly, Defendants' imposition of the nicotine-related premium differential violates ERISA § 702 because it fails to satisfy the requirements of the Final Regulations, including but not limited to 29 C.F.R. § 2590.702(f)(4) and 45 C.F.R. § 146.121(f)(4). These violations harmed not only individual participants but the Plan as a whole because surcharge dollars were collected as Plan contributions but used by Dollar General to offset its own company contribution obligation, thereby reducing the overall employer funding that should have been provided to the Plan. This diversion of funds constitutes a loss to the Plan within the meaning of 29 U.S.C. § 1109.

64. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: (A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan. *See* 29 U.S.C. § 1182(b). Because Defendants' premium differential program does not satisfy the criteria that plans must comply with to qualify as a compliant "program[] of health promotion and disease prevention," Defendants cannot qualify for the statutory safe-harbor and the tobacco surcharge is, therefore, unlawful and discriminatory. Plaintiff and Class Members are entitled to relief under ERISA § 502(a)(3).

65. Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff seeks all available and appropriate remedies to redress Defendant's violations of ERISA's anti-discrimination provisions outlined in § 1182(b) and § 300gg-4, including but not limited to declaratory relief,

28

restitution, and any other relief necessary to remedy Defendant's unlawful conduct, as set forth in the Prayer for Relief.

## COUNT II
## BREACH OF FIDUCIARY DUTY
### (Violation of ERISA §§ 404 and 406, 29 U.S.C. §§ 1104 and 1106)

66. Plaintiff re-alleges and incorporates herein by reference allegations 1–59 of this Complaint.

67. ERISA requires a fiduciary to act "solely in the interest of participants," to do so with "the care, skill, prudence, and diligence" of a prudent person, "in accordance with the documents and instruments governing the plan," and to refrain from "deal[ing] with the assets of the plan" in the fiduciary's own interest. 29 U.S.C. §§ 1104(a)(1); 1106(b)(1). These duties of loyalty and prudence are the "highest known to the law" and require fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

68. Instead of loyally and prudently acting in the best interests of Plan participants, Defendants used Plan assets to benefit Dollar General, to the detriment of the Plan and its participants, by unlawfully withholding millions of dollars in tobacco surcharges from participants' paychecks and using those funds to offset Dollar General's own obligations to contribute to the Plan. The SPD describes the Tobacco-Free Premium Credit as a premium adjustment. These surcharges were collected as before-tax deductions, alongside other Plan contributions, and thus were Plan assets from the moment of collection. The Plan should have received three funding streams: (1) employee premium contributions, (2) Dollar General's company contribution amount, and (3) the surcharge itself. Instead, Defendants used the surcharge to displace Dollar General's own contributions. Upon information and belief, Dollar General

29

further profited by retaining those amounts in its general accounts, earning interest, and failing to remit the full employer contribution owed to the Plan.

69.     Year after year, Defendants administered the Plan within the meaning of 29 U.S.C. § 1002(16) and were fiduciaries within the meaning of 29 U.S.C. § 1002(21), in that they exercised discretionary authority and control respecting the management and administration of the Plan and its surcharge programs. Defendants decided whether and how extreme the restrictions on the wellness program should be, how surcharge proceeds were handled, controlled whether participants would receive the "full reward" of avoiding the surcharge, and failed to administer the mandatory disclosures or alternatives required by ERISA's implementing regulations.

70.     The BAC controlled and disseminated to all employees the Benefit Guides and other Plan communications discussing the premium differential but failed to notify participants and provide the necessary disclosures informing them that their physicians could be involved in the process of them avoiding the tobacco surcharges. The BAC also failed to prudently review the surcharge and wellness program to ensure compliance with ERISA. Instead, the BAC allowed a structurally defective wellness program to persist year after year, depriving the Plan of employer contributions it should have received and misleading participants into believing their physicians could not intervene.

71.     ERISA also imposes on fiduciaries that appoint other fiduciaries the duty to monitor the actions of those appointed fiduciaries to ensure compliance. In allowing the BAC to impose an unlawful tobacco surcharge in connection with a noncompliant wellness program, Dollar General breached its fiduciary duties to supervise and monitor.

72.     As a result of the unlawful surcharges, Dollar General enriched itself at the expense of the Plan. By deducting these amounts directly from participants' paychecks without

30

administering a compliant wellness program, Dollar General secured financial savings for itself while participants and the Plan bore increased costs. The SPD makes clear that failure to meet rigid deadlines—such as completing a Health Assessment within 45 days and five cessation-coach calls by deadlines throughout the year—results in forfeiture of the credit. This structure ensured that "all similarly situated individuals" could not obtain the full reward for the plan year and further reinforced the impression that physician involvement was unavailable. In this way, Defendants transformed what should have been employer-funded plan contributions into unjust enrichment for themselves, contrary to 29 U.S.C. § 1104(a)(1)(A).

73.     Further, by withholding unlawful tobacco surcharges from participants' paychecks and using those funds to reduce its own financial obligations to the Plan, Defendants caused the Plan to engage in transactions that constituted a direct or indirect exchange of Plan assets for the benefit of a party in interest—namely, Dollar General—in violation of 29 U.S.C. § 1106(a)(1). Dollar General is a party in interest, as defined under 29 U.S.C. § 1002(14), because it is both the Plan sponsor and a fiduciary exercising discretionary authority through the BAC.

74.     By retaining the tobacco surcharges, Dollar General increased its own corporate assets and saved the money it would otherwise have contributed to the Plan. In doing so, it dealt with Plan assets for its own benefit, in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), which prohibits fiduciaries from engaging in self-dealing. The surcharges should have supplemented, not displaced, Dollar General's contributions. By retaining and misusing them, Dollar General benefitted at the expense of participants, leaving the Plan underfunded compared to what it should have received under its governing documents.

75.     Defendants breached their fiduciary duties by: failing to properly disclose material information about the wellness program to participants, thereby depriving them of the ability to

31

make informed choices; administering a wellness program that violated ERISA's anti-discrimination provisions; acting on behalf of a party whose interests were adverse to the Plan and its participants, in violation of ERISA § 406(b)(2); and failing to prudently review the Plan and surcharge program to ensure compliance. These breaches caused Plaintiff, the Class, and the Plan itself to incur unlawful costs. Had Defendants complied with their fiduciary duties, they would have communicated all necessary notices and disclosures, ensured that surcharge proceeds were deposited into the Plan as additional funding or used to offset costs for the entire Plan, and safeguarded participants from bearing unlawful costs.

76.     As a direct and proximate result of these fiduciary breaches, the Plan lost millions of dollars in the form of reduced employer contributions and diverted surcharge proceeds. The surcharges collected from participants were used to offset Dollar General's obligations, depriving the Plan of assets it should have received.

77.     Plaintiff is authorized to bring this action on a representative basis on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2). Plaintiff is also permitted, in the alternative, to bring a claim under 29 U.S.C. § 1132(a)(3). Pursuant to 29 U.S.C. § 1109, Defendants are liable to: make good to the Plan all losses resulting from their breaches; disgorge unjust enrichment and ill-gotten profits; and restore to the Plan, or to a constructive trust for the Plan, all profits acquired through their violations.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

32

A. An Order certifying this action as a class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as Class representative for the Class, and appointing the undersigned to act as Class Counsel;

B. A declaratory judgment that the unlawful and discriminatory tobacco surcharges imposed on participants violate ERISA's anti-discrimination provisions set forth in ERISA § 702, 29 U.S.C. § 1182;

C. An Order instructing Defendants to reimburse all persons who paid the unlawful and discriminatory surcharge;

D. A declaratory judgment that Defendants breached their fiduciary duties in violation of ERISA § 404, 29 U.S.C. § 1104 for, *inter alia*, instituting a surcharge on participants without offering a reasonable alternative standard in violation of ERISA's anti-discrimination provisions and for failing to notify participants of an alternative standard, and for failing to adequately monitor the terms of the Plan, the surcharge, and the wellness program, as well as communications with participants, to ensure they complied with ERISA and the applicable regulations;

E. An Order requiring Defendants to provide an accounting of all prior payments of the surcharges under the Plan;

F. Declaratory and injunctive relief as necessary and appropriate, including enjoining Defendants from further violating the duties, responsibilities, and obligations imposed on them by ERISA with respect to the Plan and ordering Defendants to remit all previously collected surcharges;

G. Disgorgement of any benefits or profits Defendants received or enjoyed due to the violations of ERISA § 702, 29 U.S.C. § 1182(b);

33

H.  Restitution of all surcharge amounts Defendants collected;

I.  Surcharge from Defendants totaling the amounts owed to participants and/or the amount of unjust enrichment obtained by Defendants as a result of its collection of the unlawful and discriminatory tobacco surcharges;

J.  Relief to the Plan from Defendants for their violations of ERISA § 404, 29 U.S.C. § 1104, under 29 U.S.C. § 1109, including a declaration that the tobacco surcharges are unlawful; restoration of losses to the Plan and its participants caused by Defendants' fiduciary violations; disgorgement of any benefits and profits Defendants received or enjoyed from the use of the Plan's assets or violations of ERISA; surcharge; payment to the Plan of the amounts owed to members who paid the surcharges; removal and replacement of the Plan's fiduciaries, and all appropriate injunctive relief, such as an Order requiring Defendants to stop imposing the unlawful and discriminatory surcharges on participants in the future.

K.  An award of pre-judgment interest on any amounts awarded to Plaintiff and the Class pursuant to law;

L.  An award of Plaintiff's attorneys' fees, expenses, and/or taxable costs, as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

M.  Any other relief the Court determines is just and proper.

Dated: September 12, 2025 Respectfully submitted,

**SIRI & GLIMSTAD LLP**

/s/ *Oren Faircloth*

Oren Faircloth (*pro hac vice*)
R. Scott Pietrowski (Tenn. Bar. No. 019853)
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: ofaircloth@sirillp.com
E: spietrowski@sirillp.com

*Attorneys for Plaintiff and the Proposed Class*