# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

REGINA D. MILLER, on behalf of herself and all others similarly situated,

        Plaintiff,

        vs.

DOLLAR GENERAL CORPORATION and the BENEFIT ADMINISTRATION COMMITTEE.

        Defendants.

**Civil Action No.: 3:25-cv-599**

**Chief Judge William L. Campbell, Jr.**

**Magistrate Judge Barbara D. Holmes**

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S ERISA § 502(a)(2) CLAIMS AND TO COMPEL PLAINTIFF'S REMAINING CLAIMS INTO INDIVIDUAL ARBITRATION

**SIRI & GLIMSTAD LLP**

/s/ *Oren Faircloth*

Oren Faircloth (*pro hac vice*)
William H. Payne, IV (Tenn. Bar. No. 029509)
R. Scott Pietrowski (Tenn. Bar. No. 019853)
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: ofaircloth@sirillp.com
E: wpayne@sirillp.com
E: spietrowski@sirillp.com

*Attorneys for Plaintiff and the Proposed Class*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... III

I. INTRODUCTION ........................................... **ERROR! BOOKMARK NOT DEFINED.**

II. BACKGROUND .............................................. **ERROR! BOOKMARK NOT DEFINED.**

    A. STATUTORY FRAMEWORK: ERISA'S ANTI-DISCRIMINATION RULE .... **ERROR! BOOKMARK NOT DEFINED.**

    B. REGULATORY REQUIREMENTS FOR OUTCOME-BASED WELLNESS PROGRAMS......... **ERROR! BOOKMARK NOT DEFINED.**

    C. COMPLIANCE GAPS IN DOLLAR GENERAL'S WELLNESS PROGRAM ..... **ERROR! BOOKMARK NOT DEFINED.**

        1. Omission of the Required Physician-Accommodation Disclosure.....**Error! Bookmark not defined.**

        2. Inconsistent Plan Materials and Misplaced "Reasonable Alternative Standard" Paragraph....................................................................**Error! Bookmark not defined.**

    D. MS. MILLER ALLEGES DEFENDANTS VIOLATED ERISA'S ANTI-DISCRIMINATION PROVISIONS AND BREACHED FIDUCIARY DUTIES. ....... **ERROR! BOOKMARK NOT DEFINED.**

III. ARGUMENT.................................................... **ERROR! BOOKMARK NOT DEFINED.**

    A. THE ARBITRATION AGREEMENT DOES NOT REACH THESE ERISA CLAIMS AND, IN ANY EVENT, CANNOT WAIVE REPRESENTATIVE § 502(A)(2) REMEDIES. .... **ERROR! BOOKMARK NOT DEFINED.**

        1. The Arbitration Agreement Expressly Excludes ERISA Benefit Claims.............. **Error! Bookmark not defined.**

i

2. Even Absent the Carve-Out, the Arbitration Agreement is Unenforceable Because it Cannot Eliminate Plan-Wide ERISA Remedies ...........**Error! Bookmark not defined.**

B. LEGAL STANDARD FOR RULE 12(B)(6) MOTION. ......... **ERROR! BOOKMARK NOT DEFINED.**

C. PLAINTIFF HAS ADEQUATELY ALLEGED LOSSES TO THE PLAN AND FIDUCIARY MISMANAGEMENT ....................................................... **ERROR! BOOKMARK NOT DEFINED.**

1. ERISA Authorizes Both Restoration of Plan Losses and Disgorgement of Fiduciary Profits ........................................................................**Error! Bookmark not defined.**

2. Courts Across Jurisdictions Recognize This Theory of Plan Harm. ..**Error! Bookmark not defined.**

3. The Tobacco Surcharge Fails the Wellness Program Safe Harbor Because Defendants Failed to Include Required Disclosures in All Plan Materials Discussing the Surcharge ...................................................................................**Error! Bookmark not defined.**

D. DEFENDANTS ACTED IN A FIDUCIARY CAPACITY BY MANAGING CONTRIBUTIONS, REFUNDS, AND PARTICIPANT COMMUNICATIONS ........ **ERROR! BOOKMARK NOT DEFINED.**

1. Defendants' Authorities Are Inapposite; Plaintiff's Authorities Align with the Allegations in the FAC................................................**Error! Bookmark not defined.**

2. Dollar General Dealt with Plan Assets in Its Own Interest ......... **Error! Bookmark not defined.**

IV. CONCLUSION............................................. **ERROR! BOOKMARK NOT DEFINED.**

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)...................................................................................... 11, 12

*Bailey v. Sedgwick Claims Mgmt. Servs. Inc.,*
  2025 U.S. Dist. LEXIS 190335 (W.D. Tenn. 2025).......................................*passim*

*Bassett v. Nat'l Collegiate Athletic Ass'n,*
  528 F.3d 426 (6th Cir. 2008) ............................................................................ 12

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ..................................................................................... 11, 12

*Bokma v. Performance Food Grp., Inc.,*
  783 F. Supp. 3d 882 (E.D. Va. 2025) .........................................................2, 18, 24

*Briscoe v. Fine,*
  444 F.3d 478 (6th Cir. 2006)............................................................................. 21

*Buescher v. N. Am. Lighting, Inc.,*
  2025 U.S. Dist. LEXIS 135992 (C.D. Ill. 2025)................................................... 2

*Cedeno v. Sasson,*
  100 F.4th 386 (2d Cir. 2024) ............................................................................. 10

*Chirinian v. Travelers Co.,*
  2025 U.S. Dist. LEXIS 144669 ......................................................................... 15

*Cunningham v. Cornell Univ.,*
  145 S. Ct. 1020 (2025)........................................................................................ 4

*Doe v. Baum,*
  903 F.3d 575 (6th Cir. 2018) ............................................................................. 12

*Donovan v. Bierwirth,*
  754 F.2d 1049 (2d Cir. 1985)............................................................................. 15

*Duke v. Luxottica U.S. Holdings Corp.,*
  2024 U.S. Dist. LEXIS 216345 (E.D.N.Y. Nov. 27, 2024)................................. 18

*Fifth Third Bancorp v. Dudenhoeffer,*
  573 U.S. 409 (2014)........................................................................................... 22

*Fisher v. GardaWorld Cash Serv. Inc.*,
2025 U.S. Dist. LEXIS 167251 (W.D.N.C. 2025)................................................................ 15

*Fleming v. Kellogg Co.*,
2024 U.S. App. LEXIS 26709 (6th Cir. Oct. 2024)........................................................ 10, 11

*Griffin v. Flagstar Bancorp, Inc.*,
2011 U.S. Dist. LEXIS 35080 (E.D. Mich. Mar. 2011) ........................................................22

*Harrison v. Envision Mgmt. Holding, Inc.*,
59 F.4th 1090 (10th Cir. 2023) .......................................................................................... 10

*Hawkins v. Cintas Corp.*,
32 F.4th 625 (6th Cir. 2022) ..................................................................................... 10, 11, 16

*Henry ex rel. BSC Ventures Holdings, Inc. Emp. Stock Ownership Plan v. Wilmington Tr. N.A.*,
72 F.4th 499 (3d Cir. 2023) ............................................................................................... 10

*Hi-Lex Controls, Inc. v. BlueCross Blue Shield*,
*751 F.3d 740 (6th Cir. 2014)* ......................................................................................*passim*

*Hughes Aircraft Co. v. Jacobson*,
525 U.S. 432 (1999)............................................................................................................22

*Hunter v. Caliber Sys., Inc.*,
220 F.3d 702 (6th Cir. 2000) ..............................................................................................22

*Keys v. Humana, Inc.*,
684 F.3d 605 (6th Cir. 2012) ............................................................................................. 12

*Kuper v. Iovenko*,
66 F.3d 1447 (6th Cir. 1995) ..............................................................................................22

*LaRue v. DeWolff, Boberg & Ass., Inc.*,
552 U.S. 248 (2008)..................................................................................................... 15, 16

*Lockheed Corp. v. Spink*,
517 U.S. 882 (1996)............................................................................................................22

*Mass. Mut. Life Ins. Co. v. Russell*,
473 U.S. 134 (1985)........................................................................................................... 16

*Mehlberg v. Compass Grp. USA, Inc.*,
2025 U.S. Dist. LEXIS 84589 (W.D. Mo. 2025).....................................................2, 18, 24

iv

*Parker v. Tenneco, Inc.,*
   114 F.4th 786 (6th Cir. 2024) ............................................................... 10, 15, 16, 18

*Phelps v. C.T. Enters.,*
   394 F.3d 213 (4th Cir. 2005) ............................................................................... 20

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
   566 U.S. 639 (2012) ............................................................................................... 9

*Sec'y of Labor v. Macy's, Inc.,*
   2021 U.S. Dist. LEXIS 221603 (S.D. Ohio 2021) .............................................. 23

*Sims v. First Horizon Nat'l Corp.,*
   2009 U.S. Dist. LEXIS 90449 (W.D. Tenn. Sept. 2009) ...................................... 23

*Smith v. Bd. of Dirs. of Triad Mfg., Inc.,*
   13 F.4th 613 (7th Cir. 2021) ............................................................................... 10

*Trs. of the Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.,*
   843 F.3d 561 (2d Cir. 2016) ............................................................................... 14

*United States v. Grizzle,*
   933 F.2d 943 (11th Cir. 1991) ............................................................................ 13

*Viking River Cruises, Inc. v. Moriana,*
   596 U.S. 639 (2022) ............................................................................................ 11

*Waggoner v. Carle Found.,*
   No. 24-cv-2217, ECF 27 (C.D. Ill. Sept. 16, 2025) .....................................*passim*

**Statutes**

29 U.S.C. § 1104(a)(1)(A) ....................................................................................... 18

29 U.S.C. § 1104(a)(1)(D) ....................................................................................... 22

29 U.S.C. § 1106(b) ........................................................................................... 14, 18

29 U.S.C. § 1109(a) ........................................................................................... 14, 15

29 U.S.C. § 1106(b)(1) ............................................................................................ 14

29 U.S.C. § 1135 ....................................................................................................... 4

29 U.S.C. § 1182(b)(1) ................................................................................................ 3

29 U.S.C. §1182(b)(2)(B) ........................................................................................... 3

29 U.S.C. § 1191c ...................................................................................................... 4

29 U.S.C. § 2590.702(f)(4)(v) .................................................................................... 2

42 U.S.C. § 300gg-4 ...................................................................................................

42 U.S.C. § 300gg-4(b)(1) .......................................................................................... 3

42 U.S.C. § 300gg-4(b)(2)(B) ..................................................................................... 3

42 U.S.C. § 300gg–4(j)(3)(E) ............................................................................. 5, 19

ERISA § 406(b)(1) .............................................................................................. *passim*

ERISA § 409(a) .................................................................................................... *passim*

ERISA §§ 502(a)(2) ............................................................................................. *passim*

ERISA §§ 502(a)(3) ..................................................................................................... 9

**Regulations**

29 C.F.R.§ 2510.3-102(a)(1) ............................................................................ 13, 17, 24

29 C.F.R. § 2590.702(f) ......................................................................................... 3, 5

29 C.F.R. § 2590.702(f)(4) ................................................................................. 4, 8, 19

45 C.F.R § 146.121(f) ................................................................................................. 3

45 C.F.R. § 146.121(f)(4)(v) ............................................................................... 5, 19

**Other Authorities**

*Incentives for Nondiscriminatory Wellness Programs in Group Health Plans,*
    78 Fed. Reg. 33158–170 (June 3, 2013) ............................................................ *passim*

Plaintiff, Regina Miller ("Plaintiff"), respectfully opposes the motion to dismiss and to compel arbitration (Doc No. 32) filed by Defendants, Dollar General Corporation and the Benefit Administration Committee ("Defendants" or "Dollar General").

## I. INTRODUCTION

Dollar General's motion begins with a fundamental misstep. The arbitration agreement it relies on expressly excludes "claims for benefits under the Employee Retirement Income Security Act ["ERISA"]" from its scope. That carve-out alone disposes of Defendants' motion to compel. Plaintiff's ERISA §§ 502(a)(2) and (a)(3) claims seek Plan-wide relief to restore tobacco-surcharge amounts Defendants unlawfully diverted from participants' pay and misused to offset Dollar General's own Plan contributions, and to redress fiduciary breaches in failing to provide the required physician-accommodation notice in plan materials that participants relied on during enrollment. These claims seek Plan-wide relief for fiduciary misconduct and discrimination under ERISA, so they fall squarely within the arbitration agreement's express exclusion.

Even if the exclusion did not exist, controlling Sixth Circuit precedent forecloses enforcement of the agreement as to representative § 502(a)(2) claims. Those claims belong to the Plan and cannot be forced into individualized arbitration because doing so would eliminate plan-wide remedies that ERISA guarantees and violate the "effective vindication" doctrine. The Court should therefore deny the motion to compel arbitration at the threshold.

Dollar General's liability runs deeper. Plaintiff alleges that Defendants imposed a discriminatory tobacco surcharge and administered it in direct violation of ERISA's nondiscrimination and disclosure rules. The company's Benefit Guides, the materials employees rely upon when electing coverage, omitted the mandatory notice that participants could obtain a reasonable alternative standard from their own physicians. That omission is not a technicality; the

1

regulations explicitly require that the physician-accommodation disclosure appear "in **all** plan materials describing the terms of the program." 29 C.F.R. § 2590.702(f)(4)(v); 42 U.S.C. § 300gg-4(j)(3)(D).

If employers could satisfy this rule by including the notice in some materials but not others—particularly not in those actually provided to participants—they could freely bury or withhold information about participants' rights, which is precisely what Plaintiff alleges Dollar General did. And while the Summary Plan Description ("SPD") buried a vague reference to a "reasonable alternative standard" in an unrelated section, none of the Benefit Guides distributed during open enrollment had that language. Participants were not informed of their rights to know about ways to avoid the surcharge. The inconsistency between those documents is not accidental; it reflects a pattern of misleading and incomplete disclosures that prevented participants from understanding their rights on the avenues available to avoid these discriminatory surcharges. Fiduciaries who issue materials that misstate or conceal participants' ERISA rights violate both the duty of loyalty and the duty of prudence.

Dollar General also diverted the tobacco surcharges—funds withheld from participants' wages on a pre-tax basis and therefore constituting Plan assets—to offset its own contributions to the Plan, effectively using participant money to cover a share of the company's Plan costs. That diversion reduced the Plan's funding stream and directly harmed the Plan as a whole. Such conduct represents a textbook breach of fiduciary duty under ERISA: the misuse of Plan assets for the employer's benefit and self-dealing in violation of the duty of loyalty. Sixth Circuit precedent, consistent with courts across the country addressing tobacco surcharge cases,[1] recognizes that

---

[1] *See Bokma v. Performance Food Grp., Inc.*, 783 F. Supp. 3d 882 (E.D. Va. 2025) (denying defendant's motion to dismiss breach nearly identical fiduciary duty claims), *Mehlberg v. Compass Grp. USA, Inc.*, No. 24-cv-04179, 2025 U.S. Dist. LEXIS 84589 (W.D. Mo. Apr. 15, 2025) (same),

allegations of an employer manipulating or retaining Plan contributions for its own advantage, sufficiently states a claim for fiduciary misconduct under § 502(a)(2).

Dollar General tries to recast these violations as mere "plan design," but the complaint challenges how Defendants administered the wellness program, communicated its terms, handled contributions, and used those funds. Those are fiduciary acts governed by ERISA's highest duties, not settlor functions. Fiduciaries cannot meet their obligations by distributing incomplete and misleading materials, concealing participants' statutory rights, and diverting Plan assets to benefit the employer. ERISA's duties of loyalty and prudence exist to prevent exactly that.

The Court should deny Dollar General's motion in its entirety.

## II. BACKGROUND

### A. Statutory Framework: ERISA's Anti-Discrimination Rule

ERISA and the Public Health Service Act ("PHSA") prohibit group health plans from charging higher premiums or contributions to similarly situated individuals based on any health factor, including nicotine use. *See* 29 U.S.C. § 1182(b)(1); 42 U.S.C. § 300gg-4(b)(1).[2] Specifically, a health plan "may not require any individual … to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor . . . ." *Id.*

---

*Buescher v. N. Am. Lighting, Inc.*, No. 24-cv-2076, 2025 U.S. Dist. LEXIS 135992 (C.D. Ill. June 30, 2025); *Bailey v. Sedgwick Claims Mgmt. Servs. Inc.*, No. 2:24-cv-02749, 2025 U.S. Dist. LEXIS 190335 (W.D. Tenn. Sep. 26, 2025) (same); and *Waggoner v. The Carle Foundation.* No. 2:24-cv-02217, ECF No. 27, at 67 (C.D. Ill. Sept. 16, 2025) (same).

[2] Section 2705, 42 U.S.C. § 300gg-4, was added to ERISA through incorporation with the passing of the Affordable Care Act. *See Incentives for Nondiscriminatory Wellness Programs in Group Health Plans*, 78 Fed. Reg. 33158–170 (June 3, 2013) (hereinafter the "**Final Regulations**"); *see also* 29 C.F.R. § 2590.702(f) and 45 C.F.R. § 146.121(f) (implementing regulations for §§ 1182 and 300gg-4, respectively). Together, these statutes (ERISA and the PHSA) and the Final Regulations regulate the administration of group health plans and the use of outcome-based wellness programs like the one Defendants impose.

3

Congress carved out one narrow exception: a plan may offer a *reward*—such as a premium discount or rebate—for participation in a bona fide "program of health promotion or disease prevention." *See* §§ 1182(b)(2)(B) and 300gg-4(b)(2)(B). The employer invoking this exception bears the burden of proving full compliance with the regulatory criteria.[3] If even one element of those requirements is missing from the materials that describe the program, the exception fails, and the surcharge reverts to unlawful discrimination based on a health factor. *Id.*

Recognizing the potential for abuse, Congress directed the Departments of Labor, Health and Human Services, and Treasury (the "Departments") to promulgate detailed regulations (i.e., the Final Regulations) to determine whether a surcharge and wellness program are truly promoting health, as opposed to being a "subterfuge for discrimination." *See* Final Regulations, 33158–60.[4] The Departments have made clear that these strict criteria "***must be satisfied*** in order for the plan or issuer to qualify for an exception to the prohibition on discrimination based on health status." *See* Final Regulations, 33160. Once a participant alleges a discriminatory surcharge, as Plaintiff does here, the burden shifts to the employer to show compliance with each of the regulatory prerequisites. *See Cunningham v. Cornell Univ.*, 143 S. Ct. 1776, 1784–85 (2024) (recognizing that regulatory compliance functions as an affirmative defense, and the burden may shift to defendants). FAC, ¶ 62.

---

[3] *See* First Amended Complaint, Doc. No. 30, ("FAC"), ¶¶ 21–23, 62 (explaining "these rules set forth criteria for an ***affirmative defense*** that can be used by plans and issuers in response to a claim that the plan or issuer discriminated" (emphasis added)); *see also* 29 C.F.R. § 2590.702(f)(4) and 45 C.F.R. § 146.121(f)(4) (stating that a "health-contingent wellness program . . . does not violate the provisions of this section **only if <u>all</u> of the following requirements are satisfied**" (emphasis added)).

[4] *See* 29 U.S.C. § 1191c (authorizing the Secretary of Labor to "promulgate such regulations as may be necessary or appropriate to carry out the provisions of this part."); 29 U.S.C. § 1135 ("the Secretary may prescribe such regulations as he finds necessary or appropriate to carry out the provisions of this subchapter."). *See* First Amended Complaint, Doc 34 ("FAC"), ¶ 23.

4

### B. Regulatory Requirements for Outcome-Based Wellness Programs

Dollar General's tobacco policy is an outcome-based wellness program. Because eligibility turns on achieving or completing a health-related outcome (i.e., being tobacco free or completing the program), the "full reward," "uniform availability," and "notice" requirements of the regulations squarely apply. See 29 C.F.R. § 2590.702(f). Compliance with these criteria determines whether the program qualifies for the safe harbor; failure of any element defeats the exception. To qualify for ERISA's safe harbor, a wellness program must satisfy *all* five criteria:

1. **Frequency of Opportunity to Qualify** – Participants must be provided with at least one opportunity per year to qualify for the reward.
2. **Size of Reward** – The total value of any reward or penalty must not exceed 50% of the cost of employee-only coverage.
3. **Reasonable Design** – The program must be reasonably designed to promote health or prevent disease, and not serve as a "subterfuge for discrimination based on a health factor." To meet this requirement, a reasonable alternative standard must be provided to any individual who does not meet the initial outcome.
4. **Uniform Availability and Full Reward** – The full reward must be available to all similarly situated individuals who satisfy the alternative standard.
5. **Notice Requirement** – "The plan must disclose in all plan materials describing the terms of the program *the availability of other means of qualifying for the [full] reward*." Final Regulations, 33159 (emphasis added).

The phrase "all plan materials describing the terms of the program"—found in both the statute, 42 U.S.C. § 300gg-4(j)(3)(E) and the Final Regulations, 45 C.F.R. § 146.121(f)(4)(v)—encompasses any document provided to participants that explains the surcharge or the corresponding reward, such as the SPDs and annual Benefit Guides. Because the tobacco-use surcharge is described in both, each must include the required physician-accommodation notice to meet the regulatory standard.

### C. Compliance Gaps in Dollar General's Wellness Program

Dollar General administered an outcome-based wellness program that imposed a $40 monthly "Tobacco-Free Premium Credit" surcharge on participants who used tobacco products,

unless they completed a multi-week cessation program through a third-party vendor. FAC, ¶¶ 6, 31–34. Participants pay the surcharge via pre-tax payroll deductions and become eligible for a lump-sum year-end refund up to $480 upon program completion. *Id.*, ¶¶ 32, 44.

### 1. Omission of the Required Physician-Accommodation Disclosure

The Benefit Guides—participants' primary enrollment materials—describe the surcharge and credit, but omit the required physician-accommodation notice. FAC, ¶¶ 31–33. The 2021 Benefit Guide provides:



## Earn a Tobacco-Free[1] Premium Credit

Indicate your tobacco-use status on your HA:

- ▮ Are you tobacco-free? Receive a monthly $40 Tobacco-Free Premium Credit.
- ▮ **Need help quitting or preventing relapse?** The Better Life Tobacco Cessation Program can support you in your tobacco-free journey. Plus, if you complete[2] the program, you'll earn up to a $480 Tobacco-Free Premium Credit at year-end.[3]

  To enroll, upon completing the HA and tobacco-use attestation, join the "My Personal Tobacco Wellness Coach" activity on DGWell and schedule your first call with a coach.

[1] Tobacco products include cigarettes, pipes, cigars, and smokeless forms including chewing tobacco, snuff and dip, and electronic cigarettes.
[2] Program completion is defined as completing four (4) tobacco cessation calls with your coach (once every 45 days beginning the day you join the program).
[3] If eligible, the year-end credit will be provided as a lump-sum payment on your paycheck. You must be actively enrolled in the Medical Plan at the time of payment to receive the credit. Amount based on number of months in the Medical Plan during the year and subject to applicable tax withholdings.

That is the entirety of the description. The Guide does ***not*** reference that a participant could qualify for the full reward through a physician-recommended alternative or any right to physician involvement. Under the Final Regulations, however, any plan materials "describing the terms of the program" must include "a statement that recommendations of an individual's personal physician will be accommodated." Final Regulations, 33166. The surcharge is described in the Benefit Guides, but they do not contain the physician-accommodation notice. These omissions predictably caused participants to pay surcharges they could have avoided. *Id.*, ¶ 41.

6

### 2. Inconsistent Plan Materials and Misplaced "Reasonable Alternative Standard" Paragraph

The SPDs include only a brief reference to a "Reasonable Alternative Standard," but it appears only within the "Better Life Wellness Program" section—an unrelated initiative tied to a separate $60 Wellness Premium Credit—not in the "Tobacco-Free Premium Credit" section. *See* Ex. 1 to Latham Decl., Doc. No. 21-1, PageIDs 117–18, 230–31, 341–42, 448–49, 556–58, 667–68, 784–86. Nothing in the SPDs links that disclosure to the tobacco program or explains that participants may qualify through their own physician's recommendation. The Tobacco-Free Credit appears under a separate heading with no mention of reasonable alternatives or physician involvement.

Both the SPD and Benefit Guides impose a rigid completion schedule requiring participants to: (a) complete a health assessment within 45 days of enrollment; (b) complete four to five coaching calls at 45-day intervals; and (c) remain actively enrolled at year-end to receive reimbursement. See id. Participants who enroll late, miss a call, or leave before year-end receive only a pro-rated or no credit. FAC ¶¶ 31–32, 35. Earlier SPD versions listed contact information for requesting reasonable alternatives, but those references were later removed. FAC ¶ 36. Taken together, Dollar General's SPDs and Benefit Guides describe a fixed-deadline, outcome-based program that omits the physician-accommodation notice from primary enrollment materials and provides no clear mechanism for requesting an alternative standard through a treating physician.

### D. Ms. Miller Alleges Defendants Violated ERISA's Anti-Discrimination Provisions and Breached Fiduciary Duties.

Defendants administered the tobacco surcharge by identifying which participants would be charged the $40 monthly "Tobacco-Free Premium Credit" and withholding the surcharge directly from employees' paychecks as a before-tax plan contribution, along with regular premium

7

deductions. FAC, ¶ 44. These deductions were treated as part of the Plan's overall funding stream, just like other employee contributions toward medical coverage, not as separate penalties. *Id.* The SPDs confirm that benefits are funded jointly by contributions from Dollar General and from participating employees via salary reduction. *Id.*, ¶ 45.

By adding the tobacco surcharge to employee contributions, Defendants created what should have been a third, independent source of Plan funding: (1) participant premium contributions, (2) Dollar General's employer contributions, *and* (3) the additional surcharge. *Id*. Instead of allowing all three streams to fund the Plan, Dollar General used the tobacco surcharge proceeds to offset its own funding obligation. *Id.* Because the cost of coverage for each tier was fixed, every dollar collected in surcharges reduced Dollar General's contribution by an equal amount, effectively shifting costs from the employer to participants. *Id*. As a result, the Plan itself received fewer overall contributions than it would have if the surcharge funds had been properly credited to it. *Id*.

Defendants compounded the problem by embedding rigid procedural deadlines that prevented "all similarly situated individuals" from earning the full reward once those deadlines passed. *Id.*, ¶ 37. Participants who missed a single step were deemed ineligible, which is contrary to the regulatory requirements under 29 C.F.R. § 2590.702(f)(4). *Id.* By structuring the program this way, Defendants created artificial barriers that limited participants' ability to obtain the full reward and effectively forfeited the credit for many employees who paid the surcharge during the year but failed to complete the coaching sequence. *Id.* The combined effect of these failures (i.e., noncompliant disclosures, rigid deadlines, and diversion of Plan assets) demonstrates that the program does not qualify as a lawful "program of health promotion and disease prevention," but an unlawful penalty that increased employee costs while reducing Dollar General's contributions.

8

## III. ARGUMENT

### A. The Arbitration Agreement Does Not Reach These ERISA Claims and, in Any Event, Cannot Waive Representative § 502(a)(2) Remedies.

#### 1. The Arbitration Agreement Expressly Excludes ERISA Benefit Claims.

Dollar General's argument fails at the threshold because the arbitration agreements it relies on expressly exclude ERISA claims. The Agreement's "Rules and Procedures" provide:

> • Covered Claims do **not** include claims for unemployment insurance benefits, workers' compensation benefits[workers' compensation discrimination and retaliation claims are Covered Claims], whistleblower claims under the Sarbanes-Oxley Act, and claims for benefits under the Employee Retirement Income Security Act. Covered Claims also do not include claims pending in court as of the date this Agreement is signed by you, and

*See* Ex. A and B to Roach Declaration, Doc No. 32-1, PageID 1045, 1048 (emphasis added). This carve-out is unqualified. By its plain terms, claims "for benefits under ERISA" fall outside the agreement's definition of "Covered Claims." Plaintiff's claims arise under ERISA §§ 502(a)(2) and (a)(3): they seek Plan-wide relief for fiduciary breaches, restoration of losses to the Plan, and injunctive and equitable relief under the Plan's governing documents. Those are claims for benefits under ERISA within the scope of the exclusion.

Dollar General's brief omits this clause entirely and instead attempts to recast Plaintiff's ERISA claims as ordinary "employment disputes" subject to arbitration simply because they arise in an employment context. Def. Br., 18–19. Defendants' brief cites decisions involving wage-and-hour, discrimination, and other routine employment matters where arbitration provisions applied broadly to disputes "arising out of employment." *Id.* But those cases are inapposite because none involved a contract containing an explicit exclusion for ERISA benefit claims. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 640 (2012) ("[I]t is a commonplace of statutory construction that the specific governs the general." (citation omitted)). The arbitration agreement here does, and provides, in unambiguous terms, that "Covered Claims do **not** include … claims for benefits under [ERISA]." Ex. A and B to Roach Declaration, Doc

9

No. 32-1, PageID 1045, 1048. That specific carve-out reflects the parties' intent that ERISA benefit and fiduciary-breach claims remain in court and directly refutes Defendants' argument that "the parties agreed to arbitrate Plaintiff's ERISA 502(a)(3) claims." Def. Br., 18. Dollar General cannot use the FAA to expand the scope of its own agreement. The plain language of the carve-out disposes of the motion to compel arbitration.

### 2. Even Absent the Carve-Out, the Arbitration Agreement is Unenforceable Because it Cannot Eliminate Plan-Wide ERISA Remedies

Even assuming *arguendo* that the agreement could be read to cover Plaintiff's claims (it cannot), it would still be unenforceable as applied to Plaintiff's representative § 502(a)(2) claims. Enforcing individualized arbitration would prospectively waive the statutory right to plan-wide relief, which is impermissible under the "effective vindication" doctrine and controlling precedent.

The Sixth Circuit has repeatedly held that ERISA's fiduciary-breach provisions create representative rights belonging to the Plan, not to any individual participant, and that those rights cannot be contracted away through individual employment arbitration clauses. *Hawkins v. Cintas Corp.*, 32 F.4th 625, 635 (6th Cir. 2022) (employment arbitration agreements "do not subject these claims to arbitration" because participants act as representatives of the plan, not in their personal capacity); *Parker v. Tenneco, Inc.*, 114 F.4th 786, 797–802 (6th Cir. 2024) (invalidating clause that confined ERISA relief to individual accounts and barred representative actions); *Fleming v. Kellogg Co.*, No. 23-1966, 2024 U.S. App. LEXIS 26709, at *14–15 (6th Cir. Oct. 21, 2024) (class and representative waiver "violates the effective-vindication exception" because it forecloses plan-wide remedies). Other circuits agree.[5]

---

[5] *See Cedeno v. Sasson*, 100 F.4th 386, 400 (2d Cir. 2024); *Harrison v. Envision Mgmt. Holding, Inc.*, 59 F.4th 1090, 1106 (10th Cir. 2023); *Smith v. Bd. of Dirs. of Triad Mfg., Inc.*, 13 F.4th 613, 615 (7th Cir. 2021); *Henry ex rel. BSC Ventures Holdings, Inc. Emp. Stock Ownership Plan v.*

10

Plaintiff's claims here exemplify that principle. She seeks restoration of Plan losses, disgorgement of profits, removal of fiduciaries, and an injunction against further violations, which is relief that, by statute, belongs to the Plan. *See Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 656–59 (2022) (holding that a representative plaintiff acts only as an agent asserting the principal's claims, and because "arbitration is a matter of consent," those claims cannot be compelled to arbitration without the principal's agreement). Compelling arbitration would deprive the Plan of any forum to pursue those remedies, contravening both ERISA's text, the effective-vindication doctrine, and the holdings in *Hawkins* and *Fleming*.

Should the Court determine that any of Plaintiff's individual claims fall within the Agreement's scope, only those claims, not the representative § 502(a)(2) claims, could be stayed under the FAA. The representative fiduciary-breach claims must proceed in this Court because they belong to the Plan and cannot be waived or arbitrated without the Plan's consent.[6]

### B.      Legal Standard for Rule 12(b)(6) Motion.

A 12(b)(6) motion challenges the sufficiency of the complaint, not the merits of the claims. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To survive dismissal, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Plausibility does not require probability; it requires only "more than a sheer possibility that a [D]efendants acted unlawfully." *Iqbal*, 556 U.S.

---

*Wilmington Tr. N.A.*, 72 F.4th 499, 507–08 (3d Cir. 2023). Each of these cases found that the arbitration agreement was unenforceable because it prevented claimants from effectively vindicating their statutory right to pursue relief on behalf of the plan under ERISA §§ 409(a) and 502(a)(2).

[6] In addition, the arbitration agreement appears to contain a separate carve-out for disputes concerning the enforceability of the agreement itself. *See* Ex. A and B to Roach Declaration, Doc No. 32-1, PageID 1045, 1048 (the sentence immediately following the ERISA carveout). Although this clause is difficult to discern from the scanned copies filed in the record, it establishes that this Court is the proper forum for determinations on the enforceability of the agreement itself.

at 678. At this stage, the Court must accept all well-pleaded factual allegations as true, construe the complaint in the light most favorable to Plaintiff, and draw all reasonable inferences in Plaintiff's favor. *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018).[7]

Rule 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief," not detailed factual allegations or proof of the plaintiff's case. Fed. R. Civ. P. 8(a)(2). The Federal Rules embody a system of notice pleading, intended merely to "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012) (quoting *Twombly*, 550 U.S. at 555). The Sixth Circuit emphasized that *Twombly* and *Iqbal* did not impose a heightened pleading requirement; rather, a complaint that provides fair notice and facts permitting a reasonable inference of liability is sufficient. *Id.*

The FAC provides detailed factual allegations that more than plausibly state claims for relief under ERISA. It therefore satisfies the liberal pleading standard required under Rule 8 and controlling Supreme Court and Sixth Circuit precedent.

### C.     Plaintiff Has Adequately Alleged Losses to the Plan and Fiduciary Mismanagement

Defendants' motion rests on the premise that the FAC alleges only individualized paycheck deductions. Def. Br., 7 (citing FAC, ¶ 44). But Plaintiff alleges a funding scheme in which payroll-deducted tobacco surcharges—treated and handled as contributions to the Plan—were used to

---

[7] In evaluating a Rule 12(b)(6) motion, the Court may also consider documents referenced in the complaint and central to the claims without converting the motion to one for summary judgment. See *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). Here, both parties reference Plan communications, like the SPDs and Benefit Guides, which are integral to the claims because they describe the terms of the challenged tobacco-surcharge program. The FAC cites those same materials, and Dollar General attaches and relies on them in its own motion. Accordingly, the Court may review the SPDs and Benefit Guides as part of the pleadings for purposes of Rule 12(b)(6).

offset Dollar General's employer funding, thereby depleting Plan assets and conferring a prohibited benefit on Dollar General. Those allegations state a plan-level injury under ERISA §§ 409(a) and 502(a)(2), and they independently support disgorgement of fiduciary profits even if loss is disputed.

The FAC alleges that the surcharge was withheld pre-tax through payroll alongside regular premium deductions and were treated as part of the Plan's funding stream. FAC, ¶ 44. As such, these surcharge amounts are Plan assets as of the earliest date on which they can reasonably be segregated from Dollar General's general assets. While Defendants argue that participant surcharges cannot constitute plan assets unless retained for 90 days, invoking 29 C.F.R.§ 2510.3-102 (Def. Br., 10), the 90-day period is a *maximum cap*, not a grace period during which employers may treat withheld wages as their own for three months. *See* § 2510.3-102(c) (titled "Maximum time period for welfare benefit plans").

The Department of Labor has interpreted the regulation to mean that once payroll deductions are made those amounts are Plan assets because they "can reasonably be segregated from the plan sponsor's general assets." *See* 61 Fed. Reg. 41220, 41231. Courts have found similarly. *See Hi-Lex Controls, Inc. v. BlueCross Blue Shield*, 751 F.3d 740, 745 (6th Cir. 2014) (recognizing that "plan assets may be composed of employee contributions even before their delivery to the plan") (citing *United States v. Grizzle*, 933 F.2d 943, 946–47 (11th Cir. 1991)). Dollar General's own SPDs confirm the surcharge is assessed through payroll as a premium adjustment and credited or withheld within the Plan's contribution mechanics. *See* Ex. 1 to Latham Declaration, Doc. No. 21-1, PageID 129 ("Benefits provided under the Plan and reasonable administrative expenses are funded by contributions from Dollar General Corporation and from participating employees through salary reduction.").

13

Against that backdrop, Plaintiff alleges that Dollar General used participant-paid surcharge dollars to reduce its own contribution to the Plan dollar-for-dollar. FAC, ¶ 45. Because the cost of coverage within each tier is fixed, every surcharge dollar withheld from wages offsets an employer dollar that would otherwise be required to be contributed to the Plan to fund benefits. *Id.* The result is a systemic reduction in Plan funding relative to the baseline that would have existed had surcharge proceeds been added to, rather than substituted for, Dollar General's contributions. That is a loss to the Plan within the meaning of ERISA § 409(a). It is also prohibited self-dealing because fiduciaries are not allowed to "deal with the assets of the plan in [their] own interest." 29 U.S.C. § 1106(b)(1). This provision, as the Sixth Circuit has made clear, means when a "fiduciary uses a plan's funds for its own purposes, . . . such a fiduciary is liable under §1104(a)(1) and § 1106(b)(1)." *Hi-Lex Controls*, 751 F.3d, at 751. Yet Dollar General retained and applied Plan assets to its own account by using them to cover its share of Plan expenses.

### 1. ERISA Authorizes Both Restoration of Plan Losses and Disgorgement of Fiduciary Profits.

Dollar General's actions resulted in both a loss to the Plan and fiduciary profit from Plan assets. ERISA § 409 provides two separate avenues for recovery from fiduciary breaches: (1) restoration of plan losses and (2) disgorgement of profits. *See* 29 U.S.C. § 1109(a) (fiduciaries are "liable to make good to such plan *any losses to the plan* resulting from each such breach, and *to restore to such plan any profits* of such fiduciary which have been made through use of assets of the plan. . . ." (emphases added)). Plaintiff pleads both. FAC, ¶¶ 44–47. Regarding loss to the Plan, ERISA measures that loss against the funding the Plan should have had but for the breach. *See Trs. of the Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 567 (2d Cir. 2016) ("Losses are measured by the difference between the plan's actual performance and how the plan would have performed if the funds had been invested 'like other funds being invested during the

same period in proper transactions.'" (citing *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985)). Further, § 409(a) requires fiduciaries to "restore to the plan any profits" derived from the misuse of plan assets. Even if the Court were to conclude at the pleading stage that the Plan's net funding cannot yet be quantified, the FAC plausibly alleges that Dollar General profited by reducing its own contribution obligations through the use of participant-paid surcharges.[8] That fiduciary profit is independently recoverable through disgorgement.

Defendants cite *Parker v. Tenneco, Inc.*, 114 F.4th 786 (6th Cir. 2024), *cert. denied*, 2025 U.S. LEXIS 141 (U.S., Jan. 13, 2025) and rely on *LaRue v. DeWolff, Boberg & Ass., Inc.*, 552 U.S. 248 (2008) to argue that § 502(a)(2) requires only plan-wide losses and that any injury traceable to participants' paycheck deductions cannot qualify. Def. Br., 7–9. That is not the law.[9] The FAC alleges plan-level mismanagement and use of plan assets (i.e., the tobacco surcharge funds) in a way that benefits Dollar General, which is a quintessential Plan injury. The "harm" is not the

---

[8] Defendants rely on *Chirinian v. Travelers Co.*, No. 24-cv-3956, 2025 U.S. Dist. LEXIS 144669 (D. Minn. July 29, 2025) and *Fisher v. GardaWorld Cash Serv. Inc.*, 2025 U.S. Dist. LEXIS 167251, at *18 (W.D.N.C. Aug. 27, 2025), where the courts dismissed the breach of fiduciary duty claims. However, in *Chirinian*, the plaintiff expressly alleged that the challenged tobacco surcharges were "collected and deposited ... in the Plan's trust," and the court concluded that the plan itself was therefore enriched rather than depleted. *Id.*, at *30. Moreover, *Chirinian* overlooked the second avenue of fiduciary liability under § 409(a): the requirement that fiduciaries "restore to the plan any profits ... made through use of plan assets." 29 U.S.C. § 1109(a). *Chirinian* erred in failing to consider the "profits" Travelers obtained through use of plan assets. The court in *Fisher*, relying on *Chirinian*, made the same error finding "irrelevant" the fact that "GardaWorld benefited from a reduced financial obligation to the Plan . . . ." *Fisher*, 2025 U.S. Dist. LEXIS 167251, at *19. This Court should avoid making the same error and view those decisions as an incomplete application of § 409(a).

[9] In *LaRue*, the Supreme Court held that a participant *can* bring a representative claim under § 502(a)(2) even if the fiduciary breach only affects that participant's account because such harm is a loss to the Plan when the Plan is a defined contribution plan. "[F]iduciary misconduct need not threaten the solvency of the entire plan to reduce benefits below the amount that participants would otherwise receive." *LaRue*, 552 U.S. at 255–56. As long as the Plan's assets are misused in a way that diminishes a participant's account—whether that's one account or one thousand accounts—that is a redressable loss under § 502(a)(2).

15

withholding of a surcharge from individual paychecks, but rather the systemic diversion of Plan assets for Dollar General's benefit. The holding in *Parker* underscores the problem with Defendant's argument.

*Parker* does not help Defendants; it hurts them because it reaffirms the dual remedies available under ERISA § 409. Relying on *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134 (1985), *LaRue*, and *Hawkins v. Cintas Corp.*, 32 F.4th 625 (6th Cir. 2022), the *Parker* Court explicitly reaffirmed that § 502(a)(2) claims are representative and remedial rights that run to the plan and that fiduciaries must "'make good to [*the] plan any losses* … resulting from' [their] breach and 'to *restore to [the] plan* any profits.'" *Parker*, 114 F.4th, at 797–98. *Parker* invalidated a clause that confined relief to individual accounts and barred representative relief because ERISA guarantees plan-wide monetary remedies under § 502(a)(2) and ERISA § 409(a). Labeling the mechanism "individual" (i.e., payroll deductions) does not convert a plan-funding practice into a purely personal injury. Here, the Plan's loss follows from the employer's dollar-for-dollar offset of its contributions with participant-paid surcharges. The fiduciary's profit follows from the same mechanism: Dollar General saved its own corporate dollars by substituting Plan assets for employer funding. Recovery of either category is sufficient to state a claim; recovery of both is authorized where, as here, Plaintiff alleges both a diminished Plan funding stream and fiduciary savings extracted from Plan assets.

Further, *Parker* recognized that mismanagement theories like excessive fees or improper menu design are plan-wide harms where "if the[] two named individuals were swapped with two other Plan participants, 'nothing material in the complaint would need to be changed.'" *Id.*, 798 (citing *Hawkins*). Plaintiff alleges the same type of injury. Dollar General is not only withholding Plan funds from participants, but also causing the Plan to appear "fully funded" with monies

16

subject to disgorgement and recoupment without bothering to hold that money in trust. FAC, ¶¶ 45–47. That is the kind of plan-level mismanagement § 502(a)(2) was designed to remedy. When an employer substitutes its own contributions with participant surcharges and treats the Plan as an internal funding source, it inflicts a loss on the Plan as a whole.

### 2. Courts Across Jurisdictions Recognize This Theory of Plan Harm.

The Western District of Tennessee has already recognized this precise theory of plan-level harm. In *Bailey*, the court held that the plaintiffs plausibly alleged plan-level losses where surcharge funds were withheld from wages, commingled with plan assets, and used to offset employer contributions, allegations materially identical to those here. *Bailey*, 2025 U.S. Dist. LEXIS 190335, at *52. The court rejected the argument that such harm was "individual," explaining that once employee contributions are withheld for plan purposes, they become plan assets under 29 C.F.R. § 2510.3-102(a)(1). *Id.*, at 56–59. *Bailey* further confirmed that fiduciaries act in a fiduciary capacity when assessing, collecting, and retaining such funds, and that using plan assets to benefit the employer violates both §§ 404(a)(1) and 406(b)(1). *Id.* In short, *Bailey* reaffirmed that replacing employer contributions with participant surcharges states a fiduciary-breach and plan-loss claim under § 502(a)(2).

The Central District of Illinois reached the same conclusion in *Waggoner*. There, the complaint alleged that "[a]s a result of the imposition of the unlawful and discriminatory surcharge, Defendant enriched itself at the expense of the Plan, resulting in it receiving a windfall." *Waggoner*, No. 2:24-cv-02217, ECF No. 27, at 67. Judge Bruce held that these allegations sufficiently alleged fiduciary conduct and "a loss to the Plan." *Id.* The same is true here. The FAC does not allege that one participant overpaid in isolation; it alleges that Defendants restructured

17

Plan funding by replacing employer contributions with participant surcharges and reducing Plan assets available to pay benefits and expenses. FAC ¶¶ 45–47.

The *Bokma* court also permitted the plaintiffs' breach of fiduciary duty claims to proceed, finding "Defendant 'increased its own monies and saved the money it would have had to contribute to the Plan,' thereby 'deal[ing] with Plan assets for its own benefit.' These allegations plausibly plead that Defendant violated (1) its duty of loyalty under 29 U.S.C. § 1104(a)(1)(A) to act 'solely in the interest of the participants' and (2) its duty pursuant to 29 U.S.C. § 1106(b) to not deal with Plan assets in its own self-interest." *Bokma*, 783 F. Supp. 3d, at 902. *Mehlberg* likewise found allegations sufficient where the defendant "took those [surcharge] amounts, did not deposit them into the Plan, used them to offset its own contribution amounts, and otherwise used them to profit at the expense of the Plan." *Mehlberg*, 2025 U.S. Dist. LEXIS 84589, at *19. Under *Parker* and its progeny, this is classic plan-level mismanagement.

Together, *Bailey, Waggoner, Bokma,* and *Mehlberg* reflect a consistent principle: a complaint adequately pleads plan-level harm when it details how an employer diverts, retains, or commingles participant contributions to enrich itself at the Plan's expense. *See Duke v. Luxottica U.S. Holdings Corp.*, 2024 U.S. Dist. LEXIS 216345, at *20 (E.D.N.Y. Nov. 27, 2024) (finding that allegations that allowed the defendant "to save money *by reducing the amount contributed to the Plan to fund benefits*" was sufficient to state a claim under § 502(a)(2)) (emphasis in original)). Under this framework, Plaintiff's allegations that Defendants used Plan assets (i.e., the surcharges), retained and applied them for Dollar General's benefit, and failed to provide the required physician-accommodation notice in *all* Plan materials, state plan-level harm under § 502(a)(2), fiduciary breaches under § 404, and prohibited transactions under § 406(b)(1).

18

### 3. The Tobacco Surcharge Fails the Wellness Program Safe Harbor Because Defendants Failed to Include Required Disclosures in All Plan Materials Discussing the Surcharge.

Outcome-based wellness programs qualify for the wellness program safe harbor only if ***all*** the regulatory conditions are met. *See* 29 C.F.R. § 2590.702(f)(4). Plaintiff alleges that Dollar General's Benefit Guides—the primary enrollment materials participants relied on—describe the tobacco surcharge and the "Tobacco-Free Premium Credit" but omit the required physician-accommodation statement. The SPDs, meanwhile, bury a generic reference to a "Reasonable Alternative Standard" within the separate Better Life Wellness Program section tied to a different $60 credit. *See* Ex. 1 to Latham Decl., Doc. No. 21-1, PageIDs 117–18, 230–31, 341–42, 448–49, 556–58, 667–68, 784–86. Nothing in the SPDs connects that disclosure to the tobacco program or explains that participants may obtain the full reward through an alternative standard, developed by their own physician.

ERISA and the regulations require that *all plan materials describing the terms of the program* include notice. *See* 42 U.S.C. § 300gg-4(j)(3)(E); 45 C.F.R. § 146.121(f)(4)(v). The Final Regulations clarify that notice must inform participants of (1) the availability of a reasonable alternative standard, (2) contact information for obtaining it, and (3) a statement that a personal physician's recommendations will be accommodated. Dollar General's materials do not comply. While the SPDs reference physician-accommodation—demonstrating that Defendants knew how to include it—they chose to omit that disclosure from the Benefit Guides. FAC ¶ 36. This selective omission underscores that the failure was not inadvertent but a conscious administrative choice.

Beyond the notice failures, the program's structure itself undermines uniform availability. Participants were required to complete an initial health assessment within 45 days of enrollment, adhere to a fixed schedule of coaching calls, and remain actively enrolled at year-end to receive

reimbursement. *See* FAC, ¶¶ 31–32, 35. Participants who enrolled late, missed a coaching call, or left before year-end received only a prorated, or no, credit.

These combined defects—the missing disclosures, misplaced SPD language, and deliberate omission of physician-accommodation statements from primary materials—defeat the wellness-program safe harbor and render the tobacco surcharge an unlawful premium differential based on a health factor.

### D. Defendants Acted in a Fiduciary Capacity by Managing Contributions, Refunds, and Participant Communications

Defendants try to recast Plaintiff's allegations as a challenge to "plan design." Def. Br., 11–12. This argument—now very familiar and uniformly rejected by every court to consider it in tobacco surcharge cases—fails because Plaintiff alleges ongoing fiduciary administration in at least four ways. First, Plaintiff challenges Defendants' handling and timing of participant contributions. The surcharge was withheld through payroll as part of participants' plan contributions and therefore became a Plan asset as soon as it could reasonably be segregated from general assets. FAC, ¶ 44–45. Plaintiff alleges that Defendants controlled the timing and application of those assets, including any float generated during that holding period, and failed to promptly remit the funds for the Plan's benefit. FAC, ¶¶ 32–35, 48. This ongoing management of Plan assets constitutes fiduciary conduct, not plan design. *Phelps v. C.T. Enters.*, 394 F.3d 213, 219 (4th Cir. 2005) ("Where, for example, an employer is entrusted with employee funds for remittance to a claims administrator, along with any employer contributions, the employer is acting in a fiduciary capacity under ERISA.").

Second, Plaintiff challenges Defendants' use of participant-paid assets to offset employer funding obligations. FAC, ¶¶ 44–47. Rather than adding the surcharge as a distinct third funding stream, Dollar General used those participant-paid assets to reduce its own contributions. *Id.* That

practice diminished the Plan's overall funding, conferred a financial benefit on the employer, and amounted to self-dealing in violation of ERISA § 406(b)(1).

Third, Plaintiff alleges fiduciary breaches in Defendants' discretionary refund and year-end credit decisions. FAC, ¶¶ 32–37. Defendants conditioned the so-called "Tobacco-Free Premium Credit" on participants being actively enrolled in the Plan at the time of payment, prorated the credit by months of participation, and required completion of a rigid schedule of coaching calls. *Id.* These are not fixed plan terms, they are ongoing administrative choices determining whether and when participant-paid surcharges are refunded or forfeited throughout the plan year.

Fourth, Plaintiff identifies communications that failed to notify participants of off-ramps to which they were legally entitled. The Benefit Guides that employees relied on during enrollment omitted the mandatory disclosures about physician accommodation. Year after year, Defendants failed to properly review the content of these communications to ensure they complied with ERISA's antidiscrimination provisions. FAC, ¶ 70. Meanwhile, the SPD buried a generic disclosure in a separate program section. These are failures of fiduciary communication and plan implementation, not decisions about plan design.

Courts in the Sixth Circuit have recognized that when an entity exercises discretionary authority affecting plan assets or participant benefits, it acts as a fiduciary. *See Hi-Lex Controls*, 751 F.3d, at 745–47 ("while simple adherence to a contract's term giving a party 'the unilateral right to retain funds as compensation' does not give rise to fiduciary status, a 'term [that] authorizes [a] party to exercise discretion with respect to that right' does."); *Briscoe v. Fine*, 444 F.3d 478, 494-95 (6th Cir. 2006) ("The plaintiffs … have presented competent evidence establishing that [the third-party administrator] exercised control over assets in the Company's self-funded plan by

21

allotting to itself an administrative fee and returning the remaining funds after its relationship with the Company terminated. On these facts, we hold that [the administrator] exercised at least partial control over plan assets and, to the extent that it did so, qualifies as a fiduciary."); *Bailey*, 2025 U.S. Dist. LEXIS 190335, at *50 ("the Sixth Circuit has held that fiduciary duties are imposed on entities or companies that exercise any authority or control over plan assets.").

Defendants cannot avoid fiduciary liability by labeling their misconduct as mere "implementation." Def. Br., 12–14. Under ERISA § 404(a)(1)(D), fiduciaries must administer a plan "in accordance with the documents and instruments governing the plan ***insofar as such documents and instruments are consistent with***" ERISA. 29 U.S.C. § 1104(a)(1)(D) (emphasis added). Courts have held that fiduciaries cannot "blindly follow" plan terms that contravene ERISA. *See Griffin v. Flagstar Bancorp, Inc.*, No. 2:10-cv-10610, 2011 U.S. Dist. LEXIS 35080, at *24 (E.D. Mich. Mar. 31, 2011) ("A fiduciary is not required to, and in fact may not, blindly follow plan terms if they violate ERISA") (citing *Kuper v. Iovenko*, 66 F.3d 1447, 1457 (6th Cir. 1995)); *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014) (ERISA's "duty of prudence trumps the instructions of a plan document"). The "plan made me do it" defense is foreclosed by statute and precedent alike.

### 1. Defendants' Authorities Are Inapposite; Plaintiff's Authorities Align with the Allegations in the FAC.

Defendants' reliance on *Lockheed Corp. v. Spink*, 517 U.S. 882 (1996), and *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432 (1999), is misplaced. Those cases stand only for the uncontroversial proposition that an employer acts as a non-fiduciary settlor when adopting, amending, or terminating a plan. They do not shield fiduciaries from liability for their ongoing management and use of plan assets once a plan is in operation. The same distinction governs *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 723 (6th Cir. 2000), which likewise draws a clear line

between creating a plan (a settlor act) and managing or administering it (a fiduciary function). Plaintiff challenges the latter. The FAC alleges that Defendants withheld participant contributions, controlled the flow of those funds, decided who received the surcharge refund and when, and used Plan assets to offset Dollar General's own contributions. FAC, ¶¶ 44–47.

Likewise, Defendants' citation to *Sims v. First Horizon Nat'l Corp.*, No. 08-cv-2293, 2009 U.S. Dist. LEXIS 90449 (W.D. Tenn. Sept. 30, 2009), does not advance their argument. Def. Br., 11. *Sims* did not hold that fiduciary-breach claims based on plan design must be dismissed. To the contrary, the court recognized that while a fiduciary breach cannot arise from a plan's initial design, which required investment in company stock, the plaintiffs stated a viable fiduciary-breach claim by alleging that defendants continued to mishandle plan assets after implementation. *Id.*, at 71–72 ("Under ERISA, a plan fiduciary may only follow plan terms to the extent that they are consistent with ERISA."). The decision reinforces, rather than undermines, Plaintiff's theory that ongoing misuse of plan assets constitutes fiduciary conduct subject to ERISA's highest duties.

*Sec'y of Labor v. Macy's, Inc.*, No. 1:17-cv-541, 2021 U.S. Dist. LEXIS 221603 (S.D. Ohio) does not support Defendants' position. While the court dismissed certain fiduciary breach claims, it expressly granted the Secretary leave to amend with respect to post-2013 plan years, rejecting the argument that such claims were legally foreclosed altogether.[10] In *Macy's*, the court dismissed the fiduciary breach claim, without prejudice, because the Secretary's complaint challenged plan design alone and lacked detailed allegations of ongoing discretionary conduct or

---

[10] The court expressly permitted the Secretary to amend the fiduciary duty claims for plan years after 2013 ("The Court GRANTS the Secretary leave to amend his claims for breach of fiduciary duty in the Amended Complaint in connection with the TSWP for Plan Years 2014 and following"). *Id.*, at *67.

23

misuse of plan assets.[11] The court found no allegations that Macy's exercised discretion in disclosures, administration, or asset management, and therefore held the claims amounted to a challenge to plan design. *Id.*, *62–65.[12]

Here, by contrast, Plaintiff alleges that Defendants' fiduciary failures included not just the existence of the discriminatory surcharge, but its concealment of required off-ramps and their discretionary decision to retain surcharge funds to reduce Dollar General's own obligations. *See* FAC, ¶¶ 69–73. These allegations describe active fiduciary administration, not static plan design, and they are precisely the type that multiple courts, including *Bailey*, *Waggoner*, *Bokma*, and *Mehlberg*, have found sufficient to plead plan-level harm, fiduciary status, and prohibited self-dealing.

### 2. Dollar General Dealt with Plan Assets in Its Own Interest.

The FAC alleges a straightforward self-dealing transaction: Dollar General (1) withheld the $40 monthly tobacco surcharges via pre-tax payroll alongside premium contributions (FAC, ¶ 44); (2) those amounts became plan assets "as of the earliest date" they could be segregated from the employer's general assets, 29 C.F.R. § 2510.3-102(a)(1); and (3) Dollar General applied those assets to offset its own contribution obligations, reducing Plan funding and conferring a financial benefit on itself (FAC, ¶¶ 45–47). That is the very transaction § 406(b)(1) prohibits. *See Hi-Lex Controls*, 751 F.3d, at 749–51 (use of plan assets for the fiduciary's purposes triggers liability

---

[11] *See id.,* *63 ("The Secretary does not allege that Macy's mismanaged or misappropriated Health Plan assets in connection with the [tobacco surcharge under the Plan].").

[12] Defendants misread *Bailey*. Def. Br., 13 n. 9. There, the court held that allegations of discretion over the "management or disposition" of plan assets, including commingling, retention, or offsetting contributions, state a fiduciary-breach claim. *Bailey*, 2025 U.S. Dist. LEXIS 190335, at *52–55. Plaintiff, here, alleges the same conduct: Dollar General withheld participant-funded surcharges, diverted them to offset its own contributions, and failed to administer or disclose required refunds. FAC, ¶¶ 44–47, 67, 69. The original allegations in *Macy's* were limited to simply administering a noncompliant program, not ongoing misadministration and misuse of plan assets.

under §§ 404 and 406(b)(1)); *Bailey*, 2025 U.S. Dist. LEXIS 190335, at *58–59 (finding that allegations of "retain[ing] the tobacco surcharge funds in order to enrich itself at the expense of the Plan" state a claim under § 406(b)(1)).

Dollar General cites to retirement plan forfeiture cases for the proposition that use of plan assets to cover plan expenses is not a "transaction" under ERISA § 406. *See* Def. Br., 16 (citing *Cain v. Siemens Corp.*, No. 24-cv-8730, 2025 U.S. Dist. LEXIS 147011 (D.N.J. July 31, 2025)). *Cain* concerned an employer's reallocation of *forfeitures* within a defined contribution pension plan—conduct expressly authorized by the plan documents and long permitted by ERISA and Treasury regulations—so the court found no prohibited "transaction." *Id.*, at *12–13 ("all Plaintiff has alleged is that Defendant did something expressly permitted by the Plan Document …. ERISA permits the reallocation of Forfeitures to reduce future employer contributions"). By contrast, here, Dollar General used employee payroll deductions and tobacco surcharges to fund ongoing Plan expenses, where those contributions are Plan assets from inception and were diverted for the employer's own benefit in violation of fiduciary and prohibited-transaction rules. *Cain* addressed a lawful internal accounting mechanism under a pension plan, not the misuse of participant contributions under a welfare plan, so its reasoning does not insulate Defendants.

## IV.     CONCLUSION

Based on the foregoing, Plaintiff respectfully asks the Court to deny Defendants' motion to dismiss and compel Plaintiff's remaining claims into arbitration.

Dated: October 29, 2025

Respectfully submitted,

**SIRI & GLIMSTAD LLP**

/s/ *Oren Faircloth*

Oren Faircloth (*pro hac vice*)
William H. Payne, IV (Tenn. Bar No. 029509)
R. Scott Pietrowski (Tenn. Bar No. 019853)
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: ofaircloth@sirillp.com
E: wpayne@sirillp.com
E: spietrowski@sirillp.com

*Attorneys for Plaintiff and the Proposed Class*

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 29th day of October 2025, I caused Plaintiff's Opposition to Defendant's Motion to Dismiss to be filed with the Clerk of the Court using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Oren Faircloth*

Oren Faircloth